## LAFFAN *v.* NAGLEE.

A covenant in a lease to the lessee, "his heirs and assigns," for a term of eight years, that if the lessor shall sell or dispose of the demised premises the lessee is to be entitled to the refusal of the same, is a covenant running with the land.

Every covenant in the lease relating to the *thing demised*, attaches to the land, and runs with it.

The valuable privilege of pre-emption attaches to the entire property, and is therefore assignable.

A and B entered into an agreement in which it was stipulated that A should advance $12,000 for the purpose of putting up a brick house on property of B, held by lease, and B was to convey to A one-half interest in the leased premises; the balance of the costs of the building was to be borne in equal proportion. When completed, B was to rent the same, and pay over to A one-half of the rents. Building was erected at a cost of $48,000—$30,000 paid by A, and $18,000 by B,—B conveyed one-half of premises to A : *Held,* that A and B were copartners.

And where one of two holders of the leasehold, holding in partnership, purchases the fee in his own name and with his own money, it enures equally to the benefit of the other, to which he becomes entitled on payment of his proportion of the purchase-money.

And as the relation sustained by the tenant purchasing the fee, to his co-tenant or partner, is one of confidence, the proof that the latter had waived his right must be clear, and the burden of proof rests upon the tenant purchasing.

APPEAL from the Superior Court of the City of San Francisco.

On the ninth of April, 1847, Susannah Hinkley leased to Ward and Smith certain premises in San Francisco, for a term of eight years from date, at a rate of $300 per annum. The last clause of the lease is as follows :

"The said Susannah Hinkley doth furthermore agree to permit the said Frank Ward and William M. Smith to make and complete any and every addition and improvement they may

think fit; all of which said additions and improvements are to be attached to said premises; provided, the said Susannah Hinkley pays a reasonable and assessed value for the same; and, furthermore, if the said Susannah Hinkley shall sell or dispose of the aforementioned premises and lot of ground, the aforesaid parties, Frank Ward and Smith, are to be entitled to the refusal of the same."

On the tenth of September, 1849, Smith assigned all his interest to Ward, and on the sixth of February, 1850, Ward assigned to Naglee. On the twenty-ninth of April, 1851, Laffan and Naglee entered into a written agreement, in which it was stipulated that Laffan should advance $12,000, for the purpose of putting up a brick building, according to specifications thereto attached, on a lot eighty feet eight inches long, on Merchant street, by forty feet deep, the same being a portion of the leased premises. The building was to be commenced at once, and finished in seventy days; and the twelve thousand dollars were to be paid to the contractor by Laffan, as the work progressed. In consideration of which payment, Naglee undertook to convey to said Laffan one-half interest in the lot and improvements. It was also agreed that the balance of the cost of the building should be borne in equal proportion; and, when completed, Naglee was to rent the rooms, and pay over one-half the rents to Laffan, deducting therefrom fifty dollars per month ground-rent, and one-half of all necessary and proper expenditures about the management and repair of the building. On the twentieth of June, 1851, both parties having previously complied with the agreement, by erecting a building at a cost of some $48,000, $30,000 of which were paid by Laffan, and $18,000 by Naglee; the latter executed to the former a deed of assignment of the lot mentioned in the agreement. The words of the assignment are of "an undivided half of all the estate, right, title, and interest which I have in and to a certain parcel of land, (describing it,) with the like undivided half-interest in all the buildings and improvements thereon, and in the lease under which I hold the said premises; the said lot or parcel of land being part of the premises held by me under a lease made by Mrs. Susannah Hinkley;" "it being understood and agreed, however, as a condition of this contract, that the said Laffan is to be accountable to me for one-half of the ground-rent of $100 per month, to which said lot is subject; and that I am to have the management of the buildings on said lot, to rent the rooms, receive the rents, and pay over the one-half to said Laffan, deducting his proportion of the ground-rent aforesaid, and the half of all necessary and proper expenditures about the management of the buildings, and keeping them in repair." On the fifteenth of October, 1851, a purchase of the fee in the entire lot, as described in the lease of Mrs. Hinkley, was negotiated by Mr. Bolton, of the firm of Bolton,

Barron & Co., at the request of Naglee, and for his benefit. A deed was made by William M. Smith and wife, (formerly Mrs. Hinkley,) of the premises, to Bolton, for the consideration of $17,000, who on the same day conveyed all the premises back to Naglee, except a strip forming Merchant street. On the same day Naglee executed to Bolton a mortgage upon the property conveyed by Bolton to him, for the purpose of securing a loan of $30,000, payable in one year, and drawing interest at the rate of two per cent. per month from date. The $17,000, the price of the property, was paid out of this loan.

The bill in this case was filed by Laffan for a settlement of the joint transactions, and to compel the defendant to convey to him one undivided half of the lot embraced in the assignment of Naglee to Laffan. The plaintiff obtained a decree in the Court below, and the defendant appealed.

*Jo. G. Baldwin and Delos Lake* for Appellants.

1. By the terms of the assignment and contract between Naglee and Laffan, was the right of purchase of the fee of the property transferred to Laffan: *i. e.*, had Laffan an equal right with Naglee to make this purchase?

2. If this is so, then does the mere fact of the purchase by Naglee of the fee, give to Laffan the benefit of the purchase; or was Laffan bound to take any steps, and, if so, what, to entitle him to the benefits of this purchase or the right under the contract? and, as connected with this point:

3. Has Laffan shown that he has done what was incumbent upon him, in order to realize the advantages of his position?

4. Do the facts show that he has waived his right, whatever it was?

Several other propositions arise in the case, but they range themselves under the foregoing, and will be stated and illustrated in the sequel.

It is to be kept in mind that this was not a purchase, by a trustee, of the property of the *cestui que trust*. It is only pretended to be the case of a purchase by one, when both of two tenants-in-common had the right to purchase. There was no obligation on both or either to purchase. There was no obligation on the part of the original lessor to sell: nor, if she chose to sell, any price limited or fixed. Such a privilege was a mere possibility—it was an intangible, uninforcible obligation—it was, for any practical purpose, valueless. It could not have entered into the minds of the parties in making this arrangement under the lease, and it would not, therefore, raise the presumption which Judge Shattuck supposes, that the contract was made in reference to it.

We approach, therefore, the construction of the words of the

assignment, with this view of the right pretended to be assigned.

Naglee, on the 20th of June, 1851, assigns to Laffan " one undivided half of all the estate, right, title and interest, which I have in, etc., to a certain lot or parcel of land in the said city of San Francisco, etc., with the like undivided half-interest in all the buildings and improvements thereon, and in the lease under which I hold the said premises," etc.

The assignment from the Wards to Naglee, " sets over the said indenture of lease, and the estate thereby granted, together with all the buildings and improvements which have, since the date," etc.

This " right of refusal " is not mentioned in Naglee's deed to Laffan, nor is their any assignment of that right.   The refusal is not " estate, right, title or interest in a lot," nor is it a half-interest in a lease.   How could half of a refusal, given to several jointly, be divided?   If " half" could be assigned, how much further could it be subdivided?   Into how many parts? and what would be the assignable value of a twelfth in a " refusal."

We contend :

1. That this pre-emptive right was a personal privilege to the first lessee—that it was not made assignable by the terms of the lease to Smith & Ward—that it was not assigned, by the deed of Ward, to Naglee—that it is a chose not assignable at law or in equity.   What was the right?   It is called a refusal—the meaning is this : " If lessor chooses, at any time hereafter, to sell, and should offer the property for sale on such terms as she may choose, lessee may have the liberty of buying it, in preference to any one else."   This clause in the paper is no better for being in a contract of lease, than if it were anywhere else.   It has no necessary connection with the lease, or with the relation of landlord and tenant.   Now, though the Courts have gone a great length in upholding the assignment of interests, yet, we submit, they have never gone so far as to uphold the assignment of any thing less than an interest—a mere possibility of—a mere remote chance for a bargain.   See 6 Greenleaf, 200, 83 ; 8 Cowen, 206 ; 2 Gill. & J., 173 ; 1 Peters, 193 ; 12 Wend., 297 ; 3 Lit., 41 ; Preston on Titles, 75–6.

The test of the assignability of an interest is said to be, whether it would descend.   Here the lease is a chattel interest, and goes to the administrator.   It can hardly be supposed that this thing would go as assets to the administrator, nor would it go to the heir.   In truth, from its very nature, it could not go anywhere, as it could not be enforced, and 'the lessor could evade by not selling, or by fixing an arbitrary price or impossible terms; and besides, no mutual obligation existing, it was not a bargain, or a right, or founded on any sufficient consideration.

In order to settle this question, we must first see in what relation these parties stood, one to the other. They were not partners; they were tenants-in-common of a limited leasehold estate; their interests being the same though the titles accrued at different periods; that they built this property to be rented, and meant to divide the profits, is nothing unusual in cases of tenancy-in-common, and does not alter the tenure. The question, then, in its simplest form, is this : Can one of two joint lessees buy in the reversion, without giving the other the benefit of the purchase?

If these lessees had become such, upon the promise or agreement to continue their relations towards each other, as to the property, there might be some ground for this doctrine; but here there is nothing of this sort. Here, the joint business—the leasehold—was connected with the premises, and ceased when the lease expired. Neither partner had any rights after the termination of the lease, nor any associated interests, beyond finding the value of the buildings; which could have been settled as well between the partners as between them and a stranger. The rule is, that partners can not, by dealing with the firm affairs, get a selfish advantage. All the advantages of the contracts, or property, or dealings with the firm buildings can not be purchased or renewed by one at the expense of the rest; for the value of the renewal comes from the use made of the buildings as the place of business of the firm. To get the renewal would be giving one partner really the advantage of the old place of business, to which custom had come from the joint service, skill, etc. But no such principle applies to a case where the lease is held by two, with no other connection than the joint use of the leasehold estate; with no interest in the reversion, and with no peculiar right to acquire it.

It has been held, that when a man has made a bargain, and ascertains he has been defrauded, he must immediately give notice of the fraud, and offer to redeem the property, in order to enable him to resist the contract.

It should seem that the same rule ought to hold when there is a mere right of election to make a bargain. He must exercise the election immediately, or within a reasonable time, after he is called on to exercise it. He can not lie by—see the experiment made as to the speculation—advance no money—take no risk—share no responsibility—and then divide profits; still less—and then pay his part out of the profits; and yet less, get a premium for taking the property!

Another view may be taken of this question : We have shown that this is not a case of trustee or agent buying the property of the principal. It is only, at most, the case of one man buying when both had the same right to buy. But as Laffan's right was at most a mere privilege of purchase, Laffan must show, as

it was merely optional with him to buy or not, that he was at this time both willing to buy and able to buy upon the terms of the purchase. If we have shown that Naglee was not bound to wait, and Mrs. Hinkley was not bound to wait on Laffan's convenience, then Laffan must show his willingness and ability to make the purchase when the sale was to be made. He must have been ready when they were. It is evident that he lost nothing in losing a privilege which he did not intend, or was not able to avail himself of. If we concede that when Naglee bought, Laffan's right to come in was not divested, still the right was only the right to come in on the same terms with Naglee, and he must have been ready and must have tendered a compliance with those terms on his part before he could get any advantage from the purchase.

Hitherto we have impliedly considered this case as if, in a lease of partners, one partner could not purchase in the reversion for his own benefit; and we sought to distinguish the case at bar, from others falling within the supposed principle. But our concession, even thus limited, was too liberal. This is not the law even in respect to partners, leasing as such, and occupying for the benefit of the firm, the leased premises. The rule is limited to cases of leases, in which one partner procured the renewal of a lease of property, formerly leased and used by the partnership. But it has no application to cases of purchase of the reversion or fee. The rule is stated in Anderson v. Lemon, 4 Selden's R., 237.

Randall v. Russell, 3 Merrivale's R., 190, testator bequeathed leasehold estate to his wife; she afterwards renewed the lease, and then she purchased in the reversion. The bill was filed by the heirs to hold her as trustee for the renewed lease and also for the fee. That part of the bill to hold her as trustee was dismissed.

In a note to 7 Vesey, Jr., Moody v. Matthews, p. 185, note 1, the doctrine on this subject is reviewed. See note 2, p. 186. See Hardman v. Johnson, 3 Merivale, 352.

Now, upon what right does Laffan stand? Not as a *cestui que trust*—for, according to these cases, there was no estate upon which a trust could rest. He had no interest in the fee. Not again upon a resulting trust, for Naglee purchased with his own money—not Laffan's. Not upon a trust created by writing, for there was none. The doctrine of leases between partners does not apply, for that rests on the idea that a renewal is but the continuance of the estate first created—*i. e.*, of the former lease; but the sale never took effect until the termination of this lease, and it creates a new title, and there was no partnership here.

Even in the case of a purchase of trust property by a trustee, or by an attorney or agent in his own name, instead of his principal's (to which case the respondent's counsel have sought to

liken this case) it has always been held that it was competent for the *cestui que trust* or principal to ratify the act and so be estopped from questioning the validity of the purchase.

In the case of Campbell *v.* Walker, (5 Vesey, 678,) the Court say that " any trustee, purchasing the trust property, is liable to have the purchase set aside, if, in any reasonable time, the *cestui que trust* chooses to say he is not satisfied with it." * * " The trustee purchases subject to that equity; that if the *cestuis que trust* come in a reasonable time they may call to have the estate resold."

To the same effect is the case of Morse *v.* Royal, 12 Vesey, 374. So, in Prevost *v.* Gratz, Peters C. C. R., p. 368.

*Hoge & Wilson* for Respondent.

The appellant claims to be entitled to one-half of the fee of the tract of land of which he and the respondent held the leasehold, on two distinct grounds:

1. By reason of the terms and provisions of the original lease and various assignments referred to.

2. Because of the partnership, and other peculiar and confidential relations existing between the appellant and respondent.

Is there any rule or principle of law that saps the foundation of all these various business transactions, based on the pre-emption clause of the lease? It is a covenant in the lease—part of a solemn legal instrument, of as much validity as any covenant in a valid agreement to do or not to do a particular thing. This " right of refusal"—this pre-emption right, is frequently to be found in all kinds of legal instruments; sometimes in a deed conveying the fee, as in the case of Jackson *v.* Schultz, 18 Johns. R., 184. This was a conveyance of a fee-simple, subject to be defeated upon a condition subsequent. One of the conditions was, as stated by the Court, that if he was minded to sell, he should first offer the premises to the grantor, etc. Sometimes it is found in a mortgage, as in the cases cited in 1 Powell on Mortgages, 125 –6, and in the text; sometimes in leases, as in Jackson *v.* Groat, 7 Cow., 286, and in the cases there cited. In fact, a covenant of renewal of the term of a lease, on its expiration, is a substantial pre-emption right, so far as the leasehold is concerned. In Goodtitle *v.* Saville, et al., 16 East., 87, a pre-emption in growing timber thereafter to be cut was enforced. So, equity will enforce a will proposing a right of pre-emption. See 1 Sugden on Vend., 214, 6 Am., from 10th Lon. ed. In all these cases, and in all of these instruments, this right of pre-emption has been enforced, and determined to be a distinct, tangible, and valuable thing, for "practical purposes."

But it is said, and not very consistently with the first proposition (*i. e.*, that this right is "an intangible, uninforcible obligation,") "that this pre-emptive right was a personal privilege to

the first lessee," and was not assignable, and did not pass to the assignees of the lease; or, in other words, that it is a covenant that does not run with the land or leasehold. Here we must not permit the word "assigns" to deceive us; for some covenants pass with the estate whether the word "assigns" be used or not, and some estates will not carry the covenants though the word "assigns" be used. Covenants that run with the land do so independently of the mere language of the assignment, but collateral covenants do not pass under any words with the land.

This is made very clear in the case of Vernon v. Smith, 5 Barn. and Ald., 11.

But a pre-emptive right to an adjoining tract of land was held to be a collateral covenant, and therefore it would not pass to the assignee, though named. Collison v. Letson, 6 Taunt., 224.

A covenant of a renewal of the lease runs with the land, though executors or assignees are not named. The tenant's right of renewal is a part of his interest in the lease. Winslow v. Tighe, 2 Ball & Beatty, 195; Rowe v. Chichester, Amb., 715.

In Jackson ex dem. Livingston et al. v. Groat, 7 Cow., 285, the very question under consideration was raised and determined. The validity of these covenants is fully established by the case of Jackson ex dem. Lewis and wife v. Schultz, 18 John., 174. The covenants extend to every alienation. See the language of Lord Ellenborough, C. J., in the case of Roe ex dem. Bamford v. Hayley, 12 East., 454.

The assignee of an assignee, as well of a reversion as of a term, have the same rights at common law as the first assignee. Hornbridge v. Wilson, 3 Per. & Dav., 641; 4 Per. & Dav., 120; S. C., 11 Ad. & El., 403; 3 Barn. & Ald., 346; 11 Ad. & El., 186; 8 Taunt., 715.

When a covenant relates to and is to operate on a thing in being, parcel of the demise, the thing to be done is annexed to the thing demised, and shall go with the land though the word "assigns" is not used. Woodfall Land. & Ten., 277–8. So, implied covenants, from the use of the word "demise," go to the assignee of the term. Ibid., 284. As an assignee is bound by a covenant real which runs with the land, so shall he take advantage of it. Ibid., 284.

But it is said that the pre-emption right can not be divided, and avail Laffan as mere assignee of part of the leasehold.

The general rules are that a covenant is divisible and follows the land, and that covenant will lie against an assignee of a part of the thing demised. Woodfall's Land & Ten., 280. So, covenant may be brought by assignee of a part. Ibid; Van Horne v. Crain, 1 Paige, 458.

Who can for one moment doubt that it was the fixed design of the parties to the foregoing instruments, to assign each time this pre-emptive right? After Naglee assigns all his estate and

43

all his rights, and all the improvements, he goes on further to assign all his rights under the lease. There could be but one object, and that seems to have been accomplished. It was to give Laffan a perfect equality with himself in every respect, and to let him share in every favorable or unfavorable covenant.

Our conclusion is, that Laffan is entitled, by reason of the terms of the foregoing instruments, to a conveyance from Naglee of one-half the fee of the land, the leasehold of which was assigned to him by Naglee.

This brings us to the second branch of the question, that Laffan is entitled to a conveyance of one-half the fee :

2. Because of the partnership, and other peculiar and confidential relations, existing between the appellant and respondent.

This branch of the question throws out of view entirely the covenant of pre-emption, and is to be considered as if the proposition of the respondent's counsel were successfully maintained, to wit : that the pre-emptive right " was an intangible, uninforcible obligation, and for any practical purpose valueless."

They started out as co-tenants in the leasehold, and what is the end ?  Naglee has become the landlord of his own co-tenant. From a union of interest with him against a common landlord, he has become that landlord. He not only owns one-half of the improvements with Laffan, but claims to own the fee-simple, in his own sole right for his own sole use. His plain duty to Laffan is to aid him with his judgment, his sagacity, his management, and business capacity and experience, as co-tenant and co-owner in the buildings, in getting the highest price for the improvements from the landlord, or in buying the fee at as low a rate as possible. But his plain interest, now, is to get Laffan's share of the improvements as low as possible, or to sell him the fee at as high a price as possible.

Here is the very conflict that a Court of Equity does not permit to exist in one man—that is, duty against interest. Which would influence the appellant the most? Who would be sacrificed, Naglee or Laffan? Thorpe et al. v. McCallum, et al., 1 Gilm., 626.

"A man can not be at once vendor and vendee. He can not represent in himself two opposite and conflicting interests. As vendor he must always desire to sell as high, and as purchaser to buy as low as possible, and the law has wisely prohibited any person from assuming such dangerous and incompatible characters." Wormsley v. Wormsley, 8 Wheat. R., 421. See, also, opinion of Judge Johnson, p. 488 of S. C., 5 Cond. U. S. R.

"The principles of Courts of Equity will not permit that parties bound to each other by an express or implied contract, to promote an undertaking for the common benefit, should any of them engage in another concern which necessarily gives them a direct interest adverse to that undertaking." Story on Part., §

178; Glassington v. Thwaites, 1 Sim. & Stu., 124, 133; Coll. on Part., 185–6.

It does not matter how fair the transaction is.  Van Eppes v. Van Eppes, 9 Paige, 241; Hawley Cramer, 4 Cow. R., 717; Torrey v. Bk. of N. O., 9 Paige, 662; S. C., 6 Hill, 260; 4 Kent's Com., 483; 1 Story Eq. Jur., § 323; Holeridge v. Gillespie, 2 J. C. C., 33; Fonblanque Eq., 477, and note.

The principles on this subject that apply between trustee and *cestui que trust,* apply as between partners.  There may be a fraud and the party unable to show it.  1 Story Eq. Ju., §§ 322–3, pp. 318–19.

A trustee ought strictly to pursue the tenor of his way, without perverting it, directly or indirctly, to his own personal advantage.  Collyer on Part., p. 170, § 182.

The learned counsel say "they were not partners."  It is difficult to frame a definition of a copartnership, if Naglee and Laffan were not partners.  Then, certainly, Chancellor Kent, Judge Story, and Mr. Collyer, and many others have failed in describing that relationship.  They agree in saying that, "Partnership is a contract of two or more persons to place their money, effects, labor, and skill, or some or all of them, in lawful commerce or business, and to divide the profit and bear the loss in certain proportions."  3 Kent's Com., 23; Story on Part., § 2; Coll. on Part., § 3; Gilmore v. Black, 2 Fair R., 489; Jones, adm'r of Jones, v. Jones, 1 Iredell Eq. R., 332; Brownlee v. Allen, 21 Mo. R., 123–7.  See, also, Carlisle, adm'r, v. Mulhorn et al., 19 ib., 58.

In Barrett v. Swan, 17 Me. R., 182–3, the defendants had entered into an association for the manufacture of paper.  No stipulation was expressly made to share profit and loss, but it was held that this results as an incident to the prosecution of their joint business.  Why this does not constitute a partnership, (says the Court) even between themselves, it may not be easy to perceive.  See, also, to same point, Doak v. Swan et al., 8 Greenl., 170.

The case of Heirs of Ludlow v. Cooper's Devisees, 4 Ohio St. R., 2, shows a contract to buy land and improve it and share the profits, and though not near so strong a case as this, the Court held it to be a clear partnership.  "So, where two persons took a building lease, and laid out money in erecting houses, they were held to be partners with respect to this property, and the survivor was held to be a trustee of a moiety for the representatives of the deceased."  3 Sugden on Vend., 166–7, and cases there cited; Lyster v. Dolland, 1 Ves. Jr., 431, etc.  See, also, cases cited in note 2, 436.

So, where money is laid out jointly in improving the value of a leasehold vested in two, it is considered in the way of trade, so that it alters the estate in the lease at law, and makes it equitable and divisible.  1 Ch. Gen. Pr., 102, and note.  A lease taken

for the purposes of carrying on a trade, becomes, by operation of law, an incident of that trade. Foster v. Hale, 5 Ves., 208. And the law merchant excludes all title by survivorship in a lease taken jointly for the purposes of trade. Jackson v. Jackson, 9 Vesey, 597; Hall v. Haffan, 2 Lev., 188; Lake v. Craddock, 3 P. Wms., 159; Alden v. Fouracre et al., 3 Swanst., 489; Elliott v. Brown, 1 Vern., 217.

Where one partner obtains the renewal of a partneship lease in his own name, he will be held a trustee for the firm in the renewed lease. Story on Part., § 174, and cases cited, §§ 176, 7, 8; Featherstonhaugh v. Fenwick, 17 Vesey, 298, 311; Hitchens v. Congreve, 1 Russell & Mylne, 150, note B; S. C., 4 Russ., 562; Moody v. Matthews, 7 Ves., Jr., 174; 3 Sugden on Vend., 169.

" And where purchasers stand in the relation of partners, any advantage secured by one—e. g., the renewal of a lease or an abatement of incumbrances charged on the property, enures to the benefit of the others." Dart on Vend., pp. 434–6; Call on Part., § 181, pp. 169, 170.

These several cases referred to and cited are only three: Norris v. Le Neve, 3 Atk., 26; Randall v. Russell, 3 Mer., 190; Hardman v. Johnson, ib., 352.

Upon looking into these cases we are referred back to the old and leading case of the Rumford Market, being Reech v. Sanford, Sel. Ca., c. 61, and other cases covering the "tenant's right of renewal," all of which are fully explained in 4 Bacon's Ab., 221; referred to in Norris v. Le Neve, 3 Atk., 38.

In Norris v. Le Neve, the end of the particular term or estate for years terminated; also the entire right and interest of the *cestui que trust* in the subject-matter, and in all connected therewith. Therefore, there was a great difference between that case and the Rumford Market case, and other cases of leases referred to. As said in 4 Bacon, 221, above quoted, "such tenants are considered as having an ulterior interest beyond their subsisting term."

So, the case of Hardman v. Johnson, 3 Mer., 347, arose on a will. All the "several cases" referred to in 4 Selden, were will cases. The intention of the testator, of course, always prevails. The executor or trustee may do all that the will permits him to do. When he has executed the intention of the testator, he has discharged his trust.

In Hardman v. Johnson, the question was called a "new one," showing that Sir William Grant, Master of the Rolls, did not regard Norris v. Le Neve as an authority at all on that point. He stated that "he should hesitate a good deal before he refused to apply to it the principle which had been established as to the renewal of a lease. As a new point, his Honor would take time to consider."

But in Randall v. Russell, founded on a will, if you grafted the

fee, or realty, on the leasehold, which was personalty, you direct-ly thwarted the intention of the testator, for he gave "his freehold and leasehold property different ways."

The whole point of the case is summed up in a very few words in Mr. Merivale's note, "that the purchase of the reversion, not from the college, but from the person to whom it had been conveyed by the college, was not, under the circumstances, to be taken subject to the trusts of the will. *Quære:* If the purchase had been from the college itself."

The Court expressly find that, "whether Mr. Hull kept the reversion or sold it, was a matter of indifference to the plaintiffs," and that they were bound to go on and show what right or interest of theirs she acquired or defeated by making the purchase.

We have before shown how seriously the rights of Laffan are defeated by Naglee's purchase. In fact, each case cited by the appellant's counsel was lost, because it lacked the very points on which the respondent relies, and which appear in the case at bar.

The relation between tenants-in-common is in principle very similar to that between lessor and lessee. The possession of one is the possession of the other, while ever the tenure is acknowledged. Cowper, 817; Williston *v.* Watkins, 3 Pet. R., 51.

*Baldwin and Lake,* counsel for Appellants, in reply.

We do not consider that the counsel have met the main propositions in the case.

These are:

1. That Laffan had no greater right than any one else to purchase the fee.

2. That if he had, it was a mere right of purchase—not a right in the thing purchased; and that, like any other person with such right, he must exercise his privilege within reasonable time.

3. That at least he must not have declined to purchase.

4. That he could not, without a tender of the money to be paid by him, get another's property.

How is this answered? Is it at all important whether Laffan and Naglee were partners or tenants-in-common? Though, see 15 Johns., 160; 8 Wendell, 515. The counsel contend that this pre-emptive right in the original lease ran with the land and passed with the successive assignments. But we contend that it did not run at all. It is no reply to say that a right to purchase may run with the land. What we say is, that this right did not. What is this right? A refusal—binding neither Mrs. Hinkley to sell nor the lessees to buy. Even if the lessor had agreed expressly to sell, and lessee not agreed to buy. See Boucher *v.* Van Buskirk, 2 A. K. Marshall, 345, which was the case of an

agreement of purchase in a lease: *Held*, the agreement was not binding.

The case in Paige, 460, was the case of a covenant to convey on receiving $15 per acre during the term; but here Mrs. Hinkley does not bind herself to sell for any price, or on any terms, or to any one; if she chooses to sell and the lessees choose to buy, then there might be a bargain; but until then, the matter was a mere proposition, unacted on, binding no one. Now, it was for the plaintiff to show that a proposition runs with the land and and goes by assignment; that a thing void between the parties, becomes valid between other parties by being assigned.

That void in the beginning—conferring no rights then, gets valid as it grows older, and as it affects remote parties.

If Mrs. Hinkley had sold the fee to any one else, could Naglee and Laffan have complained? Certainly not. There was no semblance of a bargain to bind her. How, then, can Laffan claim from this clause anything? Is it any better for being in a lease than for being on a separate paper? It seems not. See Kentucky case.

It is a mistake to say that 1 Paige establishes a right to purchase the fee passing to the assignee. It was a case of covenant to convey the fee on receiving $15 per acre—giving no option of purchase at all to the lessee.

18 Johnson, 184, is not a case of pre-emption given to the lessee at all, but a case of restraint on alienation by lessee of an estate granted. In this case the lessee covenanted, that if he chose to sell, he should give the lessor the right of pre-emption or refusal of buying, and would not sell without his leave first obtained, under his hand and seal; and that on every such sale, with such license, he should pay to the lessor one-tenth of the money for which the premises were sold—and if he broke this covenant the lease should be void. The Court held that "these conditions were neither unlawful, impossible, nor repugnant."

7 Cowen, 287, was the same—except that the Court held this covenant of the lessee extended, by the terms of the lease, to the assignees. We suppose it can not be doubted that the lessor has a right to impose his own terms on his own lease. But this is a wholly different thing from the obligation on the lessor arising from a claim which does not bind the lessor to sell the fee, nor bind the lessee to buy it.

These are the only authorities which appear to approach the point, and the Court sees how far off they are.

If we are so far right, the next question is, whether Naglee being co-tenant with Laffan, could buy for himself, not the leasehold estate, but the reversion. We have no authority on this point in favor of the principle contended for—nothing but general principles and remote analogies. We are entitled, from the great research and the marked ability of the distinguished coun-

Laffan v. Naglee.

sel, to say, that they have cited no such case, because in all jurisprudence there is none.    We have cited several.    We now cite Blake v. Blake, 1 Cox, 266, which seems to be in point, and Maunsell v. O'Brien, 1 Jones, 176, Exch. R. (Ireland.)    In which last case it is held that a lessee has no equity against his sub-lessee who obtains a renewal from the head landlord without consulting him.    The principle of this case would seem to fall within the general argument of the counsel, at least as much as the case at bar.

The rule which distinguishes a purchase of the fee from the purchase of the lease, or a renewal of it by one partner or tenant-in-common is given.    The rule is, that those jointly interested in a particular subject (a lease e. g.) can not deal with the subject for their exclusive advantage.    But this rule can not be extended to the purchase of that which is not the joint interest.    The lease in this case is the joint property—the fee is not.

A renewal of the lease is held to be a graft on the original lease—a part of it—and therefore the renewal comes within the principle of inhibition—but the fee is not a graft on a less estate—and therefore does not fall within the rule.    See the reasoning of Sir William Grant in Featherstonhaugh v. Fenwick, 17 Vesey, 311, putting the principle on the ground that a partner renewing a lease for the premises on which the firm did business, might give him a great advantage over his other partners in forcing terms upon them.

BURNETT, J., after stating the facts, delivered the opinion of the Court—TERRY, C. J., concurring.

The first and most important question arising in this case is, whether, by the legal effect of the assignment, the *right to purchase the fee* of Smith and wife passed to Laffan and Naglee?

It is insisted by the learned counsel for the defendant that this presumptive right was a personal privilege, appertaining alone to the first lessees, and not assignable by the terms of the original lease; that it "was a mere possibility; it was an intangible, uninforcible obligation; it was, for any practical purpose, valueless, and could not have entered into the minds of the parties making the arrangements under the lease."    The substance of the privilege is well stated by the counsel in these words: "If lessor chooses, at any time hereafter, to sell, and should offer the property for sale, on such terms as she may choose, lessee may have the liberty of buying it, in preference to any one else."

It is certain that this privilege entered into the minds of the original parties to the lease, and was considered of value by them; otherwise there could have been no reason for its insertion in the lease.    It will be seen that the tenants were authorized to make whatever improvements they pleased, which

improvements were to become fixtures when the lessor paid for them. By the legal effect of the lease, Mrs. Hinkley was not bound to take the improvements at their value, but she had the privilege of doing so. If she did not choose to take them, then the tenants had the right to remove them. They were only to become fixtures, provided she paid for them. If she did not choose to take them, then the tenants had only the rights that belonged to them, as if this stipulation was not in the lease. On her part she stipulated to give the tenants the preference of purchase, should she determine to sell during the term.

That this privilege was practically valuable, is apparent from those considerations. The lease was on *long* time, at a *low* rent. If rents should go down, this privilege could not prejudice the tenants; but if they remained as they were, or went up, then this pre-emptive right became more valuable. As the lessor was receiving very low rent, paying scarcely any interest upon the value of the property, she would naturally be induced to sell upon very favorable terms, that she might invest the proceeds in more productive property. The tenants had a most complete check upon her asking an exorbitant price for the property. The practical result proved this: as Naglee purchased the reversion for $17,000, when he had previously given Ward $42,000 for the leasehold interest. She was receiving only $300 per annum rent, while the interest upon the $17,000 at two per cent. per month, (the then current rate,) would have been upwards of four thousand dollars yearly. It was greatly to the interest of the tenants to purchase in the fee, as the lessor might not be willing to take the improvements at their value, and then they could only remove them at the termination of the lease. In every practical view that can be taken of this privilege, it was valuable; and when rents went up as high as they did, it became of great value. For this reason the assignees of the original tenants must have considered it a matter of the greatest importance to them. The privilege of having the refusal of a purchase under circumstances that, in the nature of things, must compel the owner to sell at a very low price, was a most valuable one *practically*, and never could have been disregarded by the purchasers of the leasehold interest. (18 John., 174; 1 Powell on Mortgages; 16 East., 87.

As regards the question whether this covenant in the lease would pass to the assignees of the original tenants, that depends upon the fact whether the covenant ran with the land.

In the opinions of the judges, delivered in the case of Vernon *v.* Smith, (5 Barn. and Ald., 1,) the doctrine upon this subject is very clearly stated. Mr. Justice Bayley said: "The rule is, that if the covenant respect the thing demised, and be co-extensive with the estate of the person to whom it is made, and be

made with him and his assignee, it passes to his assignee." In that case the covenant was to insure the premises against fire. Mr. Justice Holyrood adopts the rule laid down by Lord Chief Justice Wilmot, that : "Covenants in leases, extending to a thing *in esse*, parcel of the demise, run with the land, and bind the assignee, though he be not named, as to repair, etc. And if they relate to a thing not *in esse*, but yet the thing to be done is upon the land demised—as, to build a new house or wall—the assignees, if named, are bound by the covenants; but if they in no manner touch or concern the thing demised,—as, to build a house on other land, or to pay a collateral sum to the lessor— the assignee, though not named, is not bound by such covenants."

Mr. Justice Best, in his opinion, refers to and adopts the opinion of Gawdy, J., in Spencer's case, in which it was said, "that a covenant that the lessor will, at the end of the term, grant another lease, runs with the land. The covenant here mentioned is not beneficial to the estate granted, in the strict sense of the words, because it has no effect until that estate is at an end; but it is beneficial to the owner, *as owner*, and to no other person. By the terms *collateral covenants*, which do not pass to the assignee, are meant such as are beneficial to the *lessor*, without regard to his continuing the owner of the estate. This principle will reconcile all the cases."

The lease of Mrs. Hinkley was to Ward and Smith, *their heirs and assigns.* Every covenant in the lease relating to *the thing demised*, attached to the land, and ran with it. This valuable privilege of pre-emption attached to the entire property, and, therefore, was assignable. It would have been of much less value to Ward and Smith, if they could not have assigned it to those who purchased of them.

There would seem to be no doubt as to the assignable character of this covenant. Woodfall L. and T., 278, 284; 7 Cow., 287; 1 Paige, 455.

The case of Anderson *v.* Lemon, 4 Sand., 552, and 4 Selden, 237, and the cases cited by the Court, are clearly distinguishable from the circumstances of this case. The case from Sandford differed from the present case in these material circumstances : 1. The main business of the partnership was the manufacture of tobacco, and the lease was a mere incident to the trade. 2. The improvements, at the end of the term, belonged to the landlord. 3. The original term of copartnership had expired, and the copartnership was continued from day to day, at the will of the parties, pending negotiations for a new copartnership upon different terms. 4. There was no pre-emptive privilege in the lessee.

The decision of the Supreme Court was reversed by the Court of Appeals, upon the ground that the acts of the partner pur-

chasing the fee were fraudulent. The Court of Appeals held that "a copartner was at liberty to make the purchase stated in that case, under circumstances free from deception and fraud, and consequently to retain it."

As the covenant in reference to this pre-emptive right of purchase constituted an essential part of the lease itself, and, therefore, ran with the land, the several assignments made by Ward, Smith, and Naglee, were ample to carry to the assignees, respectively, this right. Unless there had been a clear and unmistakable reservation of this privilege in the assignment, it must have passed along with the leasehold interest to the assignee.

The second question arising in this case is, whether the purchase by Naglee of the fee in his own name, and with his own money, enured to the equal benefit of Laffan. This question is naturally divisible into two heads : 1. Were Naglee and Laffan copartners ? 2. If so, did Laffan, under the circumstances of this case, waive his rights ?

We think there can be no doubt as to the question of copartnership. We have substantially decided this point in the late case of Gray v. Eaton and others. In that case, we held that there could be a partnership in the purchase and sale of lands, and we can see no difference in principle between such a partnership, and that in the joint purchase, improvement, and leasing of property for profit. All the circumstances necessary to constitute a partnership, existed in this case. The copartners contributed equal portions of the cost of the property, and then divided the net profits arising from the rents. The purpose of the arrangement was the profit to be derived from the property when leased to others, and not the enjoyment or use of it by the individual copartners themselves. The property was purchased and improved for the purpose of carrying on the regular joint business of leasing the same for profit. The relation the parties sustained to each other was not that of mere tenants-in-common; it was something more ; it was that of partners.

The question as to whether Laffan waived his right to share in the fee, is one of some difficulty. In considering this point, we must keep in view the facts that the parties were copartners; that this pre-emptive right was a part of the partnership property ; and that Naglee was the *sole* managing partner. The relation that Naglee sustained to Laffan was one of great confidence, requiring the utmost good faith on the part of Naglee. The proof, therefore, that Laffan waived his right, must be clear.

The plaintiff alleges, in his complaint, that the purchase of the property, through Bolton, was made clandestinely, by Naglee, with intent to defraud his copartner. The deed from Smith and wife to Bolton, was acknowledged and recorded October 15, 1851. The deed from Bolton to Naglee, was acknowledged on the eighteenth of December, 1851, and recorded on the nineteenth.

The mortgage from Naglee to Bolton was acknowledged on the fifteenth of October, 1851, and recorded on the nineteenth of December, 1851. It was shown that Laffan left San Francisco for New York on the sixteenth of December, 1851, and returned November 1, 1854. In reference to the two deeds and the mortgage, Mr. Bolton testified that they were to have been executed all on the one day; that he had supposed they were so consummated, but could not then assign a reason why they were not.

These circumstances certainly made out a *prima facie* case of fraudulent concealment. In his answer, Naglee alleged that Laffan had notice of his intention to purchase the property, on his own account; that Laffan declined to join in the purchase; and he, accordingly, purchased for himself. To sustain this allegation, and to disprove the alleged fraudulent concealment, Naglee produces, in evidence, with the consent of the plaintiff's counsel, a letter written by Laffan, on board the steamer Panama, off San Diego, and dated December 17th, 1851. Before leaving, Laffan had appointed Issaac E. Holmes his agent and attorney, and the letter was addressed to him. After stating that, "leaving in a hurry, he may have omitted many things," and after referring to some other matters, the letter contains this reference to the purchase of the fee :

"Naglee told me Bolton, Barron & Co. bought the ground on which our building and his, on the corner, stands, for, I think, $17,000, and that my portion would be one-fourth. Considering that I had already paid $12,000 for the lease, I thought the one-fourth more than my proportion; but when I was prepared, I would be willing for two persons to say what it should be. Admitting my account, which must be insisted on, he ought to owe $2,000 for rent account to first of December, if all be collected, besides the current rents."

In the same letter, he states his "aim shall be directed to procure, if no more, ten or twelve thousand dollars, in order that you may, by your management, save the brick house for my children. This will be important, and let other matters take their course."

If we take this language, in connection with the established facts, then the following conclusions seem plainly to flow from it :

1. That Laffan knew that Bolton had purchased the fee of the entire property for $17,000.

2. That the purchase was made for him and Naglee in their respective proportions.

3. That Naglee and Laffan did not agree about the proportion of the $17,000 to be paid by Laffan.

4. That Laffan was to pay his rightful proportion when he was prepared.

5. That Laffan's first object was to save the property for his children.

This letter clearly disproves Laffan's allegation of fraudulent concealment, while it as clearly disproves Naglee's allegation that he told Laffan he intended to purchase on his own account, and that Laffan declined to join in the purchase.   Both parties seem to have forgotten some of the circumstances.   This was not at all surprising, as both parties had passed through a severe financial ordeal, and their complex transactions had taken place some four years before the commencement of the suit.

There was nothing suspicious in the fact that Naglee took the deed from Bolton in his own name.   Naglee had about five-sixths interest in the fee, and became *solely* accountable to Bolton for the loan of the purchase-money.   Besides this, it would have required separate deeds from Bolton, and separate mortgages back to him.   Laffan being then very much embarrassed in his circumstances, and the purchase being made on credit, it was very natural that Naglee should not be willing to be solely bound for the purchase-money, without any security, and it was equally proper that Laffan should have consented to this form of the conveyances.

For the purpose of showing that Laffan had waived his right to participate in the purchase of the fee from Smith and wife, the defendant gave in evidence a copy of a written proposition, dated November 3, 1853, and signed alone by Naglee, wherein he recites that Holmes claimed the interest of Laffan in the leasehold property; that Laffan disputed Holmes' claim; that the fee of the property was then in Naglee; and then goes on to state that in consideration of one dollar paid by Laffan to him, and divers other good considerations, Naglee agreed to sell one-half the fee of the lot for the sum of ten thousand dollars, one-half payable within nine months, and the other half out of the first rents thereafter accruing to Laffan.   Naglee left the writing with Laffan, and kept no copy, but afterwards wrote Laffan for a copy, which was furnished in the handwriting of Laffan, and this copy was given in evidence.

It was also insisted by defendant that Laffan had lost his right by delay.

It was admitted by the parties, on the trial, that Isaac E. Holmes, the attorney in fact of Laffan, had "so managed the affairs of Laffan as to procure or suffer certain judgments to be rendered against said Laffan, under which the leasehold in the property in controversy was sold, and purchased by Holmes, for his own use; and that, shortly after the departure of Laffan, Holmes claimed the property for himself, until July 31, 1854, when Laffan instituted a suit against said Holmes, in which said Naglee was appointed receiver; and such proceedings were had that, in the fall of 1855, the purchases by Holmes were set aside,

Laffan *v.* Naglee.

as fraudulent and void, and said Laffan restored to his property," etc. The original complaint, in the case of Laffan *v.* Holmes, charging fraud against Holmes, was verified by the affidavit of Naglee, who acted as the agent of Laffan, stating, in the affidavit, " that the facts, matters, and things mentioned and alleged in the complaint, were peculiarly within the knowledge of affiant."

The copy of the proposition of Naglee was endorsed in his handwriting, as follows : " A proposition—H. M. Naglee to E. Laffan, Nov. 3, 1853, for nine months."

This proposition was made to Laffan in New York, about a year before his return to San Francisco, and while Holmes was in possession of Laffan's leasehold property and receiving all the rents. The only proof that Laffan ever accepted the proposition, is the fact that he had it in possession, and sent Naglee a copy at his request. There is no proof that he acted upon it in any way. At the time it was made, the circumstances were such that he could not act. Under these circumstances, we can not infer that the proposition was accepted. It is true that it gave notice, to Laffan, of the fact that the property was then held in the name of Naglee. But he was not in a condition at that time to accept or reject. Nor was Naglee in a condition to comply. This seems evident from a clause in his proposition. He first states that Laffan contemplated proceedings against Holmes, to controvert his claim to the property, and then, in the close of the proposition, states : " But it is expressly understood, that if the legal proceedings aforesaid should be abandoned before the time aforesaid, then this agreement should be void." From this condition, it seems evident that Naglee, at that time, supposed that he held the legal title for the party entitled to the leasehold interest, and that he wished to .reserve the undivided half in his own name, until it was ascertained whether Holmes or Laffan was the proper party to receive the deed.

As regards the alleged delay, we think there is nothing in the objection, when the circumstances are considered. Laffan left December 16, 1851, and his agent, Holmes, very soon so managed matters as to become himself apparent owner of the property; and it was not until the fall of 1855, that the question with him was set at rest. From that period until the commencement of this suit, (February 5, 1856,) there was not more than a reasonable time for consulting with counsel, and preparing the papers for this suit.

The property in the fee having been originally purchased for the benefit of both parties, in accordance with the terms of the lease, it still retains the character of partnership assets ; and the *onus* of proving that Laffan had waived his right, resting upon the defendant, and his proofs not sustaining his allegations in this

respect, the interlocutory decree of the Court below was correct.

It now becomes necessary to notice the exceptions made by defendant to the report of the referee.

The first exception regards the original proportion of the whole purchase-money of $17,000, which Laffan was bound to pay. The referee adopted this mode. He deducted from the cost of the fee of the entire demised premises, the proportionate value of the strip of twenty-eight feet nine inches, dedicated for Merchant street. The whole lot, described in the lease of Mrs. Hinkley, fronted sixty-eight feet nine inches on Montgomery street, running back one hundred and thirty-seven feet six inches. The strip, twenty-eight feet nine inches, by one hundred and thirty-seven feet six inches, was taken from one side of the lot for a street, in November, 1850. Naglee at that time received from various parties altogether the sum of $10,600 for opening Merchant street.

It is insisted by the learned counsel for the plaintiff, that the street was dedicated in 1850, in anticipation of Naglee's purchasing the fee; and that, when he obtained the fee, " he yielded the dedication of the street as a thing of course—as a matter of mere duty and obligation, for which he was prepaid."

But this ground does not seem to be well taken. It seems clear that Naglee was only paid the value of the interest he then held in the strip, and no more. He paid for the whole leasehold property $42,000, and estimating his leasehold interest in the strip dedicated for the street at its proportionate value, the amount exceeds $17,000, when he only received $10,600. The difference was no doubt made up of his own portion of the contribution. Those who paid him, no doubt knew that Smith and wife must sell, and Naglee must buy, and that when the street was *once* open, whoever did purchase the fee of the demised premises, would be compelled, by their own interest, to keep open the street, otherwise the rear of the property could not be approached. But there is no evidence to show that Naglee *agreed* to purchase this strip, or that, in case he did purchase it, he would continue the dedication. There was no obligation imposed upon Naglee to dedicate the fee, and when he did so dedicate it, it was for the common benefit of the property, in proportion to the respective interests of himself and Laffan. If Laffan asks to share the benefit of this dedication, he should bear his proportion of the price. The $17,000 should have been estimated as the cost of the lot, forty by one hundred and thirty-seven feet six inches, and the relative proportion of the purchase-money ascertained upon that basis. It is clear that Laffan had the benefit of the street up to the termination of the lease; and if he asks an interest in the fee, he must bear his share of the cost of that which renders his

own portion valuable. We think the referee erred in this respect, and this exception should have been allowed.

The second exception to the report of the referee is, that Naglee was not allowed compound interest. This exception, we think, is not well taken.

The third exception is, that the referee credited the plaintiff with fifty dollars per month ground-rent, from October 15, 1851, to April 9, 1855, the time of the expiration of the lease, with the interest upon each month's rent. It is stated by the learned counsel for defendant, that the referee estimated the amount of this ground-rent which Naglee was compelled to refund, at four thousand two hundred dollars principal, and three thousand seven hundred and eighty dollars interest; making, in all, the total sum of seven thousand nine hundred and eighty dollars. The counsel has not referred us to the page of the record; but if his statement is correct as to the *amount*, the referee has charged Naglee more than double the proper sum. The rent, at the rate of fifty dollars per month for the time specified, would not quite amount to two thousand one hundred dollars, exclusive of interest. As to the principle requiring the ground-rent to be refunded, we think there was no error in the report of the referee.

The other exceptions to the report, we think not well taken.

For the reasons stated, the judgment must be reversed, and the cause remanded for further proceedings.