[Civ. Nos. 5963, 5964.   Fourth Dist.   Apr. 9, 1959.]

Estate of CHARLES F. BIALY, Deceased.   PEARL BIALY, Respondent, v. BANK OF AMERICA NATIONAL TRUST AND SAVINGS ASSOCIATION (a National Banking Association), as Executor, etc., et al., Appellants.

[Two Cases.]

Guerin, Guerin & Graham, Guerin & Guerin, John J. Guerin and David Welts for Appellants.

M. S. Bernard, Harry J. Crawford, Richard E. Reese and Charles C. Montgomery, Jr., for Respondent.

MUSSELL, J.—This is an action by Pearl Bialy, the divorced wife of Charles F. Bialy, deceased, to have executor declared constructive trustee of community property and for declaratory relief. By stipulation of the parties and by order of the trial court the action was consolidated with and tried as a part of the probate proceedings in the matter of the estate of Charles F. Bialy, deceased. The trial court rendered judgment impressing a trust on one-half of the property of decedent's estate as being the community property of the plaintiff and decedent. The Bank of America National Trust and Savings Association, as executor, and defendants Marie B. Turner and Teresa Musselwhite, children of the decedent by a former marriage, appeal from the judgment.

Charles F. Bialy was born in Poland. He married Josefa Bialy in Russia in 1906 and this marriage continued until terminated by the death of Josefa in August, 1946. Their daughter, appellant Marie Turner, was born in Lithuania in 1907 and their other daughter, Teresa Musselwhite, was born in Roumania in 1910. Respondent Pearl Bialy was born in Lithuania November 30, 1899. Decedent's wife, Josefa, and respondent were first cousins. Prior to the time respondent came to America in 1913 she lived in Lithuania about 8 miles from the home of decedent. She visited the home of decedent and his wife and they, in turn, visited the home of respondent's father, with whom respondent lived.

Decedent came to America early in 1914 and in 1916 or 1918 met respondent in Chicago, where she was living with her brother. Soon thereafter respondent and decedent obtained an apartment in Chicago and lived together there for about two years. There was no marriage ceremony between respondent and decedent until December 16, 1947. In this connection respondent testified that shortly after decedent met her he told her he was going to marry her and stay with her; that he said he had a license and that she believed him, although she knew Josefa in the old country; that he gave her a ring and told her they were married. When asked if she considered herself married to the decedent, she replied, "I don't know."

A son, Alfred, was born to decedent and Pearl in 1919 and in 1921 decedent went to a technical school, where he took a two-year course, after which he came back to Chicago and while working in a hospital there, he met Henry Dawson, a 15-year-old cripple, became his nurse and went to California to take care of him. In 1921 respondent moved to East Orwell, Ohio, and purchased a farm in partnership with one Sophia Jacoba. They made a down payment on the purchase price of $2,500 and gave a mortgage as security for the balance. Mary, the second child of respondent and decedent, was born on the Ohio farm in 1924. The decedent was in Chicago at that time. Respondent moved to Cleveland, Ohio, in 1934 or 1935, where she worked in a store. She testified in her deposition that she was separated from the decedent from 1920 to 1942. However, there is substantial evidence in the record that decedent and respondent did not live together from 1921 to 1945, with the exception of occasional visits.

On March 23, 1943, respondent withdrew $1,000 from a savings and loan account in Cleveland, Ohio, and sent it to

decedent at Pasadena, and on October 9, 1943, decedent and respondent opened a small joint account at a savings and loan company in Pasadena. Respondent came to Pasadena to live in about 1945. At that time decedent had retired and was living by himself. He told his daughter, Mrs. Turner, that respondent was coming to Pasadena to be a housekeeper for him. Decedent and respondent then lived together in Pasadena in Mr. Dawson's house, then on San Gabriel and then on Nina Street.

In 1946 decedent received a letter informing him that his wife, Josefa, had died in Lithuania on August 18, 1946. He discussed this letter and the death of his wife with his daughter, Mrs. Turner, in the presence of respondent. Mrs. Turner testified that decedent stated that since Josefa was gone, it would be better for him to marry respondent instead of having her as housekeeper. Decedent and respondent were legally married at Santa Ana, California, on December 16, 1947.

The record shows that prior to this marriage decedent had acquired real property in Pasadena which sold at different times for $82,000, Orange County real estate (two items acquired in 1948), which sold at different times for $29,000 (not including residence) and stocks in 1946, amounting to $66,764. Decedent's income and earnings, after his marriage to respondent in 1947, consisted of the rents, issues and profits of property previously acquired by him as shown by his income tax returns.

Respondent testified that she sent decedent $1,000 from her savings and loan account in Cleveland and gave him another $2,000 by giving him her pass book when she came to Pasadena. However, the record of said account shows that the total amount in said account was $1,665.14, which was withdrawn by respondent $1,000 on March 23, 1943, and $665.14 on October 4, 1943. Respondent further testified that decedent used the money she gave him from the savings and loan account in the purchase of the property on Sierra Madre Boulevard in Pasadena and that all money furnished by her at or about the time she came to Pasadena was used in connection with Pasadena real estate purchased by the decedent.

At the time of his death in 1955 decedent left property which was appraised in his estate at $205,835.53. It consisted of cash, stocks, notes secured by trust deeds on real estate, and the residence property at Costa Mesa. Decedent's will and codicil, in which he left most of his property to his children, was admitted to probate on December 2, 1955, and the Bank

of America was appointed executor thereof. The bank filed its inventory and appraisement of the estate on April 27, 1956. On September 24, 1957, Marie Turner and Teresa Musselwhite filed notices of appeal in the probate matter, as did the executor, appealing from the judgment entered in the within civil action.

In August, 1952, respondent was living in the house on Sierra Madre Boulevard. This property was in decedent's name and he sold it to a school. Respondent refused to move out of the house and went to see R. H. Aarons, an attorney. She testified in this connection that she was having trouble with decedent; that she was fighting for her property; that she told Aarons she wanted to make a property settlement agreement with Bialy and that she wanted to get settled up with him.

Attorney N. J. Clarke, who represented Bialy during the negotiations, testified that Bialy stated it was his intention to divide equally the property mentioned in the property settlement agreement and that this was the general conversation. Attorney Aarons stated that after discussion Bialy agreed that respondent was entitled to half.

A property settlement agreement was entered into between the parties on August 16, 1952. The specific real property mentioned therein consisted of the Sierra Madre Boulevard property in Pasadena (then in the process of being sold), the property on Nina Street in Pasadena, and the residence property and lots in Costa Mesa. Bialy stated he had no cash, stocks or bonds or brokerage accounts. He took the position that all the property belonged to him, individually; that the agreement was unfair to him because it did not give him a fair share of the community property and that the $21,500 trust deed was half of his entire worth. Under this agreement respondent was to and did receive a $21,500 trust deed, which was approximately $2,000 more than the valuation placed on the property therein and she was to give Bialy a note for $2,000 and pay the attorneys' fees.

The property settlement agreement provided, among other things, that it was the desire of the parties to settle their respective property rights for all times, irrespective of whether they might become divorced, continue to live apart, or resume marital relations; that all property acquired by either of them would be their respective property, including the future income of each of them; that the settlement was a complete disposition and release of the property rights existing between

them; that the agreement might be submitted to any court for approval and if so approved, it should be made a part of the decree in any action for divorce, and further, that "Each party solemnly and specifically avers that the foregoing agreement has been separately read and entered into after advice of counsel, and without undue influence, fraud, coercion or misrepresentation, or for any cause except as herein specified, and that it contains the entire agreement of the parties."

After the 1952 property settlement agreement was entered into decedent and respondent lived in Pasadena for a short time and then moved to Costa Mesa. They went to Europe early in 1953 and then returned to Costa Mesa.

Bialy filed a divorce action against respondent in Orange County on September 29, 1953, and in this action respondent's attorney, Mr. Bradley, made an affidavit and obtained a subpoena duces tecum which was served on Bialy requiring him to bring his income tax records and his records of stocks, bonds and securities into court on October 2, 1953. When the case was called in court, it was announced by plaintiff's counsel that a dismissal had been filed. On December 8, 1953, Bialy filed against respondent an action for declaratory relief in the Pasadena Branch of the Superior Court of Los Angeles County. In this action it was alleged that a controversy existed between the parties as to the validity of the 1952 property settlement agreement. Respondent was represented by Mr. Aarons and Edward P. Hart. She filed an amended answer, alleging, among other things, that the property settlement agreement was entered into through fraudulent representations by decedent as to his worth and that decedent falsely represented that he had no stock, no bonds or other property. It was further alleged that respondent furnished decedent money to purchase property as partners and that she worked improving the property that was purchased by decedent. She also attached to her answer a notice of rescission of the property settlement agreement. The pretrial order in this matter contained the statement that the main question in the action was the validity of the property settlement agreement. On June 14, 1954, judgment was entered in this action reciting that the parties, through their respective counsel, had entered into and filed a stipulation regarding the judgment to be rendered in said action, waiving findings of fact, conclusions of law and the rights of new trial and appeal. The judgment stated that the court was fully advised in the premises and it was ordered, adjudged and decreed that the said property

settlement agreement was fair, valid, subsisting and in full force and effect; that it was binding on both parties and enforceable according to its terms; that there had been no reconciliation or other change of substance affecting any portion thereof.

On February 24, 1954, respondent, through her same attorneys, filed an action for separate maintenance against Bialy in the Superior Court of Orange County, being case Number 66205. In the complaint respondent alleged that Bialy had active brokerage accounts with certain named firms which had in their possession community property belonging to the parties, and in her affidavit in support of an order to show cause for allowance pending trial she alleged that Bialy was in possession of the community real and personal property in excess of $100,000 and had income therefrom in excess of $1,000 per month. After hearing on the order to show cause, on March 26, 1954, the court made an order denying respondent's motion for an allowance pending trial. A special demurrer by Bialy was sustained on March 26, 1954. Respondent did not file an amended complaint, and on April 15, 1954, the court entered a judgment of dismissal in the action.

On June 3, 1954, Bialy filed a divorce action against respondent in the Superior Court of Orange County, being case Number 62824. It was alleged in the complaint that there was no community property and approval was asked of the 1952 property settlement agreement. Respondent filed a written appearance in said action, dated June 8, 1954, signed by her and also her attorneys, consenting that the case be tried as a default and that the 1952 property settlement be submitted to the court for approval and made a part of any decree of divorce granted in the action. An interlocutory judgment of divorce by default was granted to decedent on June 17, 1954, and by the decree the 1952 property settlement agreement was approved and made a part of the decree by reference. The affidavit for final judgment of divorce reciting that the parties had not become reconciled was notarized in Illinois by Mary Bialy, daughter of respondent and decedent, and final judgment of divorce was rendered on July 1, 1955.

On May 17, 1954, respondent appeared in the office of Jacob Chaitkin, decedent's attorney, to give her deposition in the declaratory relief action. At that time a settlement was discussed with Mr. Hart in decedent's presence. He stated that he had given respondent half of his property at the time of the settlement agreement and Mr. Hart stated he was not

prepared to show that decedent had a net worth of more than $40,000. Mr. Hart told Mr. Aarons, who entered the meeting at that time, that since they had not been able to discover any assets, perhaps they should make some adjustment of the case. A settlement was discussed and decedent made an offer of $1,500, plus cancellation of respondent's note to him. Mr. Hart recommended this settlement and Mr. Chaitkin suggested that there be an employment agreement as decedent wanted to continue to live with respondent. A settlement was agreed upon on this basis. Decedent's check for $1,500, dated June 22, 1954, payable to respondent and her attorneys, was endorsed and cashed. Respondent's note to decedent for $2,000, dated August 16, 1952, was returned to her and an employment agreement, dated June 17, 1954, between respondent and decedent was delivered.

On May 21, 1956, respondent filed the within action, alleging, *inter alia,* that at no time from June 3, 1954, until the time of the death of decedent was there any separation of the parties from their continuous cohabitation together; that at all times decedent stated to plaintiff that he had no money and no property at the time of the property settlement agreement in 1952; that decedent failed to disclose the extent of the community property then existing; that a marriage ceremony was performed between plaintiff and decedent on or about December 16, 1947, validating a recognized and existing common law marriage; that a final decree in the divorce action filed by decedent was obtained by means of a fraudulent affidavit. In the prayer plaintiff asked that the final judgment of divorce, signed on July 1, 1955, and the property settlement agreement of August 16, 1952, be declared null and void; that the court find that a putative marriage existed between plaintiff and defendant from 1916 to the date of decedent's death; that the defendant bank be ordered to hold one-half of the estate of decedent in trust, and that an injunction issue restraining the executor from parting with or distributing any of the estate until further order of the court.

The trial court found, *inter alia,* that plaintiff and decedent commenced to live together as husband and wife in the state of Illinois in the year 1916, at which time plaintiff knew decedent was married to Josefa Bialy; that decedent was married to said Josefa Bialy in Odessa, Russia, in 1906, and said marriage continued until it was terminated by the death of Josefa Bialy in 1946; that at no time either before or after the filing of the divorce complaint in action Number 62824

until the time of the death of decedent was there any true separation of the parties from their continuous open cohabitation together as husband and wife; that the affidavit for entry of the decree of divorce was false in that plaintiff falsely swore therein that there had been no cohabitation of the parties since the entry of the interlocutory decree; that the decedent falsely represented that he had no money or property other than that disclosed at the time of the property settlement agreement and at the time of negotiations for the settlement of the declaratory relief action and in court in the separate maintenance action; that plaintiff had no knowledge of property acquired during the years of their marriage; that plaintiff never had a hearing on the merits in the declaratory relief action by reason of the false representations as to the extent of the community property, knowingly made by decedent to plaintiff and her attorney; that plaintiff believed and relied on his statements; that decedent during the marriage accumulated large sums of money and concealed that fact from plaintiff; that all of the property listed in the inventory and appraisement herein was and is the community property of plaintiff and decedent and that the executor shall hold one-half of said property in trust for plaintiff, the total value of said one-half being $102,500 on November 13, 1955, subject to those costs of administration and taxes which are by law chargeable to plaintiff; that the estate of Charles F. Bialy has no interest in the community property interest of Pearl Bialy after November 13, 1955, or the fruits thereof since said date; that plaintiff had no plain or adequate remedy at law and that she must resort to equity to impose a trust on the executor herein; that none of the prior decrees were res judicata nor was the plaintiff estopped by reason of any of the prior judicial decisions; and that plaintiff was not required to restore anything of value that she might have obtained during decedent's lifetime.

The trial court ordered that plaintiff take judgment against the said bank and Marie B. Turner and Teresa Musselwhite for one-half of the estate as it appears in the inventory and appraisement, subject to costs of administration and taxes which are chargeable by law to plaintiff. It was further ordered that the said executor deliver and pay one-half of said estate now held in trust by the bank to plaintiff and make accounting together with said payment.

Appellants contend that the trial court erred in failing to determine that the interlocutory decree of divorce in action

Number 62824 and the declaratory relief action in the Pasadena Branch of the Superior Court of Los Angeles County are res judicata on the validity of the property settlement agreement of August 16, 1952. We are in accord with this contention.

■ The principle of res judicata precludes parties or their privies from relitigating an issue that has been finally determined by a court of competent jurisdiction. ■ It rests upon the sound public policy that there must be an end of litigation and accordingly, persons who have had one fair trial on an issue may not again have it adjudicated. ■ The application of the principle in a given case depends upon affirmative answers to three questions: (1) Was the issue decided in the prior adjudication identical with the one presented in the subsequent litigation?; (2) Was there a final judgment on the merits?; and (3) Was the party against whom the principle is invoked a party or in privity with a party to the prior adjudication? (*Dillard* v. *McKnight*, 34 Cal.2d 209, 213-214 [209 P.2d 387, 11 A.L.R.2d 835].)

■ In *Shore* v. *Shore*, 43 Cal.2d 677, 681-682 [277 P.2d 4], the court said:

"It is settled, however, that a judgment in a prior action between the same parties on the identical cause of action is res judicata, and a bar to a second suit thereon, not only as to issues actually determined therein but also as to issues necessarily involved. (Citations.) ■ And even though the cause of action be different, the prior determination of an issue is conclusive in a subsequent suit between the same parties as to that issue and every matter which might have been urged to sustain or defeat its determination. (Citations.)"

Respondent does not question the holdings in these cases and states in her brief that "When Pearl signed the stipulation for judgment in the Pasadena case she utterly foreclosed herself from any further relief from the property settlement agreement of 1952 unless she was induced to do so by the extrinsic fraud of Charles."

■■ In *Westphal* v. *Westphal*, 20 Cal.2d 393, 397 [126 P.2d 105], it was held that the final judgment of a court having jurisdiction over persons and subject matter can be attacked in equity after the time for appeal or other direct attack has expired only if the alleged fraud or mistake is extrinsic rather than intrinsic; that fraud or mistake is extrinsic when it deprives the unsuccessful party of an oppor-

tunity to present his case to the court; that if an unsuccessful party to an action has been kept in ignorance thereof or has been prevented from fully participating therein, there has been no true adversary proceeding, and the judgment is open to attack at any time; that a party who has been given proper notice of an action, however, and who has not been prevented from full participation therein, has had an opportunity to present his case to the court and to protect himself from any fraud attempted by his adversary; that fraud perpetrated under such circumstances is intrinsic, even though the unsuccessful party does not avail himself of his opportunity to appear before the court; that having had an opportunity to protect his interest, he cannot attack the judgment once the time has elapsed for appeal or other direct attack.

In *Jorgensen* v. *Jorgensen*, 32 Cal.2d 13, 22 [193 P.2d 728], it is said that a husband at the time of divorce or separation is entitled to take a position favorable to his own interest in claiming as his separate property assets that a court might hold to be community property; that confronted with the assertion by the husband that certain assets are his separate property, the wife must take her own position and if necessary investigate the facts; and that if the wife and her attorney are satisfied with the husband's classification of the property as separate or community, the wife cannot reasonably contend that fraud was committed or that there was such mistake as to allow her to overcome the finality of a judgment.

In *Collins* v. *Collins*, 48 Cal.2d 325, 330-331 [209 P.2d 420], it was held that when one undertakes an investigation and proceeds with it without hindrance, it will be assumed that he continued until he had acquired all the knowledge he desired and was satisfied with what he learned; that he can not be heard to say that he relied upon the representations of the other party; that when the parties to a marriage are negotiating a property settlement agreement with recognition that their interests are adverse and are dealing at arm's length, neither spouse owes to the other the duty of disclosure which he or she would owe if their relation remained in fact a confidential one.

In the instant case the record shows that the decedent and respondent at the time of the execution of the property settlement agreement, at the time of the declaratory relief action, and at the time of the interlocutory decree of divorce were dealing at arm's length. Respondent was represented by counsel at all times, who had ample opportunity to ascertain

the character and extent of decedent's property. The decedent contended that all the property was his at all times and respondent's counsel were aware of this contention. They conducted an investigation to determine the extent of decedent's property and in the declaratory relief action the main issue was the question of the validity of the property settlement agreement. Respondent's attorneys entered into a stipulation that judgment be entered declaring that the property settlement agreement was fair, valid, subsisting and in full force and effect. In the separate maintenance action filed by respondent she claimed decedent had certain brokerage accounts and that he was in possession of real property in excess of $100,000. A hearing was had on an order to show cause in said matter. Again, in the divorce action filed by decedent on June 3, 1954, it was alleged in the complaint that there was no community property and approval was asked of the 1952 property settlement agreement. In that action the attorneys for respondent consented that the case be heard as a default and that the 1952 property settlement agreement be submitted to the court for approval and made a part of any decree of divorce granted in the action. Counsel for respondent apparently did not make a thorough check of the records to ascertain decedent's real property holdings. They did not take his deposition or check his income tax returns. Under the circumstances shown by the record it is apparent that respondent had ample opportunity to present her case to the court on more than one occasion. Having had such opportunity to protect her interests, she cannot attack the judgment since the time has elapsed for appeal or other direct attack.

The trial court found that decedent and Josefa Bialy were married in Odessa, Russia, in 1906 and that such marriage continued until it was terminated by the death of Josefa Bialy in 1946; that in about the year 1916 respondent and decedent commenced living together as husband and wife, at which time respondent knew that decedent was married to Josefa Bialy. Respondent presented in evidence records of stocks and dividends kept by the decedent from 1940. These, together with income tax returns, show that the source of all of decedent's property was acquired prior to his marriage to respondent on December 16, 1947. There was no evidence that the decedent worked at any gainful occupation after this date and his total net income, exclusive of 1949, from January 1, 1948, until his death was $1,934.03, a little over $300 per year. The rents, issues and profits from the separate real property

of decedent and the increase in value thereof were decedent's separate property. (*Huber* v. *Huber,* 27 Cal.2d 784, 791 [167 P.2d 708].) The evidence before us is insufficient to support the trial court's finding that the property listed in the inventory and appraisement is the community property of decedent and respondent and the judgment awarding respondent one-half of said property was error.

In *Vallera* v. *Vallera,* 21 Cal.2d 681 [134 P.2d 681], it was held that a woman who lives with a man as his wife in the belief that a valid marriage exists is entitled, upon termination of their relationship, to share in the property acquired by them during its existence; that the essential basis of a putative marriage, however, is the genuine belief in the existence of a valid marriage. It was further held therein that the fact that a man and woman in good faith believe that they are married does not preclude the court from protecting their respective interests in jointly acquired property. In *Flanagan* v. *Capital Nat. Bank,* 213 Cal. 664, 666 [3 P.2d 307], it was held that in all of these cases the essential basis of recovery is a bona fide belief on the part of the "wife" in the existence of a valid marriage. In *Shore* v. *Shore, supra,* 43 Cal.2d 677, 679-680, the court said:

"When the property rights of the parties are properly put in issue by the pleadings in an annulment action, the court may determine them. (Citations.) If the purported marriage was not entered into in good faith, however, the court may not properly award the property of the parties as if the marriage had been valid and the property community in character. (Citations.)"

In the instant case the evidence clearly shows that respondent was well aware that the decedent was married to Josefa Bialy at the time she began living with him in Chicago. Her property rights were settled in the agreement of 1952 and the validity of that agreement was settled in the declaratory relief action, the separate maintenance action and in the action for divorce. In view of this conclusion it is unnecessary to pass upon the other points presented by appellants.

Judgment reversed.

Griffin, P. J., and Shepard, J., concurred.

A petition for a rehearing was denied May 8, 1959, and respondent's petition for a hearing by the Supreme Court was denied June 3, 1959. Traynor, J., was of the opinion that the petition should be granted.