[L. A. No. 25550. In Bank. July 26, 1961.]

TRANQUILLA VAI, Plaintiff and Appellant, v. BANK OF AMERICA NATIONAL TRUST AND SAVINGS ASSOCIATION, as Coexecutor and Trustee, etc., et al., Defendants and Respondents.

Martin & Camusi, William P. Camusi and Kenneth D. Holland for Plaintiff and Appellant.

Appel, Liebermann & Leonard and Boekel, Moran & Morris as Amici Curiae on behalf of Plaintiff and Appellant.

George M. Breslin, Michael G. Luddy, Henry G. Bodkin, Jr., E. E. Hitchcock, Cosgrove, Cramer, Diether & Rindge, Samuel H. Rindge, Wallace & Wallace, W. Woodson Wallace and Alden Reid for Defendants and Respondents.

WHITE, J.—This is an appeal by Tranquilla Vai from a judgment for defendant Bank of America as coexecutor with Henry Bodkin of the estate of Giovanni Vai, deceased, in a suit brought to rescind a property settlement agreement on the ground of fraud, for recovery of part of the property received by the husband under the agreement, and for damages in the event recovery thereof cannot be had.

Plaintiff and Giovanni (John) Vai were married in Italy in 1907 and emigrated to this country and Los Angeles in 1912. John joined his brother James in operating a winery. He remained in this business and related operations continuously from 1912 until his death in February 1957, and plaintiff actively assisted him until their only child Madeline was born in 1925. Their daughter is mentally arrested and has required constant care and attention. Apparently the relations between plaintiff and her husband had been something less than harmonious for several years before January 1953,

when she left their home in Alta Loma and moved to another residence they owned in Parkside, where she has since resided. She consulted with counsel, Mr. Hallam Mathews, on January 7, 1953. After plaintiff gave him a list of the property in which she believed John had an interest, Mr. Mathews secured a Dun and Bradstreet report on Padre Vineyard Company, owned jointly by John and his brother, and a combined report on Cucamonga Valley Wine Company and Rancho El Camino, John's individual businesses. Mr. Mathews also secured descriptions of real property in San Bernardino County and a description of the Parkside property, consisting of a 30-year-old residence with 15 apartments.

On February 6, 1953, plaintiff filed a separate maintenance action, and John was served with a "Subpoena In Re Deposition and Order to Show Cause for Support, etc. Pendente Lite." John and his attorney represented, and the trial court so found, that John's health was such that adversary proceedings would be highly detrimental; that it would not be necessary for Mr. Mathews to pursue his legal remedies of discovery; that plaintiff would be voluntarily supplied with full and complete information; and that John would negotiate a fair and equitable property settlement agreement. No further independent investigation was made by plaintiff except for an appraisal of the Parkside property which she was to receive in the property settlement agreement. Following execution of this agreement, on March 16, 1953, the action for separate maintenance was abandoned. The present action was instituted shortly after John's death.

The property settlement agreement provided that plaintiff should have one-half of any property later discovered to have been inadvertently omitted from the list of community assets. Pursuant to this clause, the trial court awarded her a total of $84,000 as her share of the following items of "after-discovered" property: 95 shares of common stock of the Bank of America, together with all dividends paid thereon since March 16, 1953, amounting to $897.75; a promissory note in the principal sum of $33,640 with $1,462.55 interest; an account payable to Giovanni Vai, from Padre Vineyard Company, in the sum of $23,000; the balance owing on a promissory note of Padre Vineyard Company in favor of Giovanni Vai in the sum of $25,630.44; the balance owing on two notes of Padre Vineyard Company to Giovanni Vai, doing business as the Cucamonga Valley Wine Company in the sum of $42,315.38.

The trial court found that the net worth of John and Tranquilla Vai at the time of the settlement was $1,270,000, not including one-half the shares of Padre, net book value of which was $800,000. All of the property was conceded by the parties to be community. There were debts for which the community was liable of $85,000. In the settlement, plaintiff received the Parkside property, valued at $150,000, $25,000 in cash, a Dodge automobile, $1,204 balance in an account in the Bank of America, and half of the Italian lire on deposit in Italy (about $1,000). She was released from any obligation to support the daughter, Madeline, and from any possible liability as coguarantor with her husband on a note securing a debt from Padre Vineyards to the Bank of America. Although she waived alimony, she was guaranteed a net income of $500 per month from Parkside, which defendant agreed to keep in repair as long as she owned it. John received the balance of the property which was, it now appears, valued at least at $1,500,000.

The complaint initiating this suit to rescind the property settlement agreement charged that in the negotiation of the property settlement, John Vai was guilty of actual fraud, consisting of allegedly false representations and intentional concealment of material facts, by which the plaintiff was deceived and defrauded. It also charged constructive fraud, consisting of breach of John Vai's duty as a fiduciary to make a free and full disclosure of all important and relevant facts. *The trial court ruled that John was not a fiduciary, that the parties dealt at arm's length, that there was no issue of constructive fraud and that there was no proof of actual fraud.*

Plaintiff contends that although the confidential relationship between herself and her husband, based on her confidence and trust in him, may have been terminated by her filing suit for separate maintenance, her husband remained in a fiduciary position in respect to her interest in the community property. He breached his fiduciary duty, she asserts, by concealing material facts and by falsely representing others.

Defendants contend that *Collins* v. *Collins,* 48 Cal.2d 325 [309 P.2d 420], is directly applicable to the facts at bar as found by the trial court. In Collins, the wife sought recision of a property settlement agreement on the ground that her husband had concealed community property assets from her and thus breached his duty of full disclosure arising out of the confidential relationship. Her attorney in Nevada where she

had gone to establish residence for divorce, requested the defendant husband to furnish them with a full and accurate list of community property. This request was never complied with. Mrs. Collins returned to California and signed an agreement prepared by defendant's attorney, and against the advice of her own counsel. Some properties standing in defendant's name were not listed in the agreement, but no attempt had been made by the defendant to conceal these properties which he claimed to be his separate property, or to hinder in any way an investigation begun by Mrs. Collins and her attorney. Manifestly, Mrs. Collins was fully aware that her husband had not disclosed any information about their community property, and expressly waived any such disclosure in writing when she executed the agreement. She knowingly chose to deal at arm's length and to rely on her own investigation of community assets. Thus by her own act, Mrs. Collins terminated the fiduciary relationship in respect to her interest in the community property and the attendant duty to disclose.

Plaintiff in the instant case discontinued the adversary proceedings commenced by her at the request of the defendant who offered to supply full and complete information concerning the property all of which was conceded to be community, and who further stated that he was willing to negotiate a fair and equitable property settlement. It would seem that plaintiff chose not to terminate the fiduciary relationship nor to deal at arm's length, but instead to take the defendant's offer at face value. She signed the agreement believing that she was fully and accurately informed as to the Vai community financial position.

Manifestly, therefore, the facts in Collins, *supra*, are markedly dissimilar from those in the instant case except insofar as both wives were represented by counsel who commenced investigations.

Section 161a (Civ. Code) provides: ''The respective interests of the husband and wife in community property during continuance of the marriage relation are present, existing and equal interests under the management and control of the husband as is provided in sections 172 and 172a. . . . This section shall be construed as defining the respective interests and rights of husband and wife in the community property.''[1]

---

[1] Civil Code, § 172: ''The husband has the management and control of the community personal property. . . .'' Civil Code, § 172a: ''The husband has the management and control of the community real property. . . ,''

Because of his management and control over the community property, the husband occupies the position of trustee for his wife in respect to her one-half interest in the community assets. (*Fields* v. *Michael,* 91 Cal.App.2d 443, 447-448 [205 P.2d 402].) Recognizing this principle, Justice Traynor, speaking for a unanimous court, stated in *Jorgensen* v. *Jorgensen,* 32 Cal.2d 13, 21 [193 P.2d 728], "As the manager of the community property the husband occupies a position of trust (Civ. Code, §§ 172-173, 158), which is not terminated as to assets remaining in his hands when the spouses separate. It is part of his fiduciary duties to account to the wife for the community property when the spouses are negotiating a property settlement agreement."

"Even divorce proceedings pending do not, in themselves, interrupt the husband's powers with respect to the management and control of community property, as the effect of such proceedings is not to take the property into the custody of the court. The husband continues to have control of it and full power to dispose of it." (*Chance* v. *Kobsted,* 66 Cal.App. 434, 437 [226 P. 632].) "When a divorce is pending the power of a husband over the community property exists until the entry of a final decree. (*Lord* v. *Hough,* 43 Cal. 581; *Chance* v. *Kobsted,* 66 Cal.App. 434, 437 [226 P. 632]; *In re Cummings,* 84 F.Supp. 65, 69.)" (*Harrold* v. *Harrold,* 43 Cal.2d 77, 81 [271 P.2d 489].)

Since the husband's control of the community property continues until there has been a division of it by agreement or by court decree, it would follow that the husband would continue to remain a fiduciary in respect to his wife's interest in the community assets until such division was made. Of course, as was the case in *Collins* v. *Collins,* 48 Cal.2d 325 [309 P.2d 420], the wife may choose not to rely on her husband and release him from the performance of his fiduciary duties.

This fiduciary relationship arises by virtue of the community property system which gives the husband management and control of such property in order that the assets be more efficiently handled, and exists only as to the community property over which the husband has control. It should be distinguished from the confidential relationship which is presumed to exist between spouses. "A confidential relation exists between two persons when one has gained the confidence of the other and purports to act or advise with the other's interest in mind. A confidential relation may exist

338

although there is no fiduciary relation; it is particularly likely to exist where there is a family relationship or one of friendship or such a relation of confidence as that which arises between physician and patient or priest and penitent.'' (Rest., Trusts 2d, § 2, comment b.)

The confidential relationship and obligations arising out of it are, therefore, dependent upon the existence of confidence and trust, but the husband's fiduciary duties in respect to his wife's interest in the community property continue as long as his control of that property continues, notwithstanding the complete absence of confidence and trust, and the consequent termination of the confidential relationship.

The prerequisite of a confidential relationship is the reposing of trust and confidence by one person in another who is cognizant of this fact. The key factor in the existence of a fiduciary relationship lies in control by a person over the property of another. It is evident that while these two relationships may exist simultaneously, they do not necessarily do so. For example, in *Estate of Cover,* 188 Cal. 133 [204 P. 583], where all of the property under the husband's control was his separate property, only a confidential relation existed. As this court there pointed out at page 144, the husband in contracting with his wife concerning his separate property, may choose either to advise his wife with her welfare in mind or to ''deal with her at arm's length and as he would with a stranger, all the while giving her the opportunity of independent advice as to her rights in the premises.''

The simultaneous existence of a confidential relationship based on trust and confidence and a fiduciary relationship arising out of control of property of another is readily apparent in many common associations—principal and agent, attorney and client, business partners, to name a few. It is evident that although the confidential relationship may be terminated by either party, if an individual continues to control property of the other he is held to the duties of a fiduciary as long as he retains such control, notwithstanding the termination of the confidential relationship.

As noted in *Fields* v. *Michael, supra* (91 Cal.App.2d 443, 447), ''The position of the husband, in whom the management and control of the entire community estate is vested by statute (Civ. Code, §§ 161a, 172, 172a), has been frequently analogized to that of a partner, agent or fiduciary. (*Estate of McNutt,* 36 Cal.App.2d 542, 552 [98 P.2d 253]; *Grolemund* v. *Cafferata,* 17 Cal.2d 679, 684 [111 P.2d 641]; *Lynam* v.

*Vorwerk,* 13 Cal.App. 507, 509 [110 P. 355]; 1 de Funiak, Principles of Community Property, § 95, p. 263.)''

The dissolution of a partnership and attendant agreements respecting partnership property appear to be remarkably similar to the dissolution of the conjugal relation and property settlement agreements. ▮ Briefly, ''in all proceedings connected with the conduct of the partnership every partner is bound to act in the highest good faith to his copartner and may not obtain any advantage over him in the partnership affairs by the slightest misrepresentation, concealment, threat or adverse pressure of any kind (Civ. Code, §§ 2410, 2411).'' (*Llewelyn* v. *Levi,* 157 Cal. 31, 37 [106 P. 219], quoted in *Yeomans* v. *Lysfjord,* 162 Cal.App.2d 357, 361-362 [327 P.2d 957], and *Prince* v. *Harting,* 177 Cal.App.2d 720, 727 [2 Cal.Rptr. 545].) ▮ In view of the nature of the relation, the necessity of exercising the highest good faith in it is especially marked between a managing partner and his copartners, and proof that one has waived his rights against the other must be clear. (*Laffan* v. *Naglee,* 9 Cal. 662, 679 [70 Am.Dec. 678], *Burrow* v. *Carley,* 210 Cal. 95, 105 [290 P. 577].) ▮ In the course of negotiations for dissolution, each partner must deal fairly with his copartners and not conceal from them important matters within his own knowledge touching the business and property of the partnership. (*Arnold* v. *Arnold,* 137 Cal. 291, 296 [70 P. 23].) ▮ Thus, one partner, in negotiating for the purchase of his copartner's interest in the partnership owes the latter the duty of fair play and full disclosure, but once the sale is consummated, the relationship between them immediately ceases and the purchaser is justified in dealing *thereafter* with the other at arm's length. (*Wise Realty Co.* v. *Stewart,* 169 Cal. 176 [146 P. 534]; 120 A.L.R. 724.)

▮ Manifestly, the fiduciary duties and rules governing their performance by a husband should be no fewer or less rigorous than those imposed upon business partners. ▮ To hold, as defendant urges, that if a wife employs able counsel upon whom she relies in negotiating a property settlement agreement in conjunction with her action for separate maintenance, that her husband is thereby released from any fiduciary duties in respect to her interest in the community property, would put a wife in a far less protected position than a partner whose partnership is being dissolved. It would ''permit the authority of the husband in controlling the com-

munity property, given him in the interest of greater freedom in its use and for its transfer for the benefit of both himself and his wife, to become a weapon to be used by him to rob her of every vestige of interest in the community property with which the law has expressly invested her. Such a conclusion would violate every sense of justice, and outrage every principle of fair dealing known to the law." (*Provost* v. *Provost*, 102 Cal.App. 775, 781 [283 P. 842].)

Plaintiff alleges that due to misrepresentations and concealments by the defendant, she was not informed as to the actual value of the community property and that she would not have executed the property settlement agreement in question had she been accurately and fully informed.

Specifically, plaintiff contends that the value of Rancho El Camino was misrepresented and concealed. The following findings in respect to Rancho El Camino were made by the trial court. Mr. Mathews, plaintiff's counsel, was shown a financial statement prepared by John showing the book value of the vineyard land at Rancho El Camino to be $200 per acre. Plaintiff's counsel was told of other vineyard land which sold for $400 to $450 an acre but that such land was closer to factories. He was not told of the price received by John ($566 per acre) for vineyard land immediately to the north of Rancho El Camino sold nine months previously. The trial court found that Mr. Mathews (plaintiff's attorney) was told that Rancho El Camino was of little market value as a vineyard and could hardly be sold when the wine market was depressed. However, on February 21, 1953, 23 days prior to the execution of the property settlement agreement, John Vai executed a sale deposit receipt for $25,000 with Donald Duncan, for the sale of Rancho El Camino, at a price of $525,000, or $814 an acre. Plaintiff was never informed of this fact. Escrow was opened four days after execution of the property settlement agreement with plaintiff, and the property duly sold to Duncan.

As additional breaches of John's fiduciary duty, plaintiff draws our attention to representations relating to the financial condition of Padre Vineyard which were made by John to his wife and her attorney. When consideration is given to representations found by the trial court to have been made to plaintiff and comparison is had with other findings as to the verity of such representations, it is readily apparent that many representations were either not true or at least only partially true. For instance, to cite a few: (1) Representation:

Little would be realized if Padre were liquidated. Finding: Padre's assets at the time of the execution of the property settlement agreement exceeded its liabilities by approximately one million dollars; it's net book value was in excess of $800,000. (2) Representation: Padre was in danger of insolvency. Finding: It was not in danger of immediate insolvency, but if its operations continued to lose money as it had in the past, a danger of insolvency existed. (3) Representation: Salaries due to John and his brother as officers of Padre had not been paid. Finding: Salaries of $300 to $500 a month had been and were currently being paid. (4) Representation: Padre owed John $80,000 to $90,000 and could not meet its obligations. Finding: Various payments, including $2,500 per month, on indebtedness owing to John had been made by Padre during the months previous to the execution of the property settlement agreement. (5) Representation: A grave danger existed that Mrs. Vai and John would be held liable on a continuing guaranty of Padre's liabilities up to $300,000 to the Bank of America. Finding: The indebtedness to the Bank was secured by the hypothecation of assets worth $1,320,729 including only a part of the wine inventory which could have been sold on the market for $435,000.

A transaction which took place in September, 1954 is indicative of the actual worth of John's one-half interest in this (Padre) company which was "in danger of insolvency." Padre organized a new corporation called Padre Holding Company, and later Alta Loma Development Corporation. John, in a split-off procedure, became the sole owner of this corporation in exchange for his Padre stock. At that time, the holding company had a net worth of $471,500 and no liabilities. By June 30, 1955, over $300,000 of its assets were in cash.

As heretofore stated, the trial court found that the net community worth at the time the agreement was signed was $1,270,000 exclusive of one half of the Padre stock which John and plaintiff owned. The net book value was $800,000. Roma Wine had offered to buy the Padre company for $850,000 cash, assuming the liabilities, and as previously noted, John received stock valued at over $400,000 in the split-off procedure noted above. So, although the trial court felt that the stock in Padre had no determinable fair market value, a valuation of $400,000 on the community interest in Padre as of March 1953 would not be excessive. This brings the net community worth up to $1,670,000. The trial court found that the obliga-

tion undertaken by John in the property settlement agreement to support Madeline for the rest of her life had a value as of March 16, 1953, of between $516,000 to $615,000. Even if this entire sum is deducted from the total community assets, there remained over $1,000,000. It is obvious that the division of the marital property under the instant agreement is an inequitable one, and one to which neither plaintiff nor her attorney would, as they contend, have agreed had they been fully informed by John Vai as to the value of the community assets.

Numerous other contentions relating to the existence of actual fraud are made by plaintiff, many of which appear to have merit. It does not seem necessary to discuss them, however, in view of our holding contrary to that of the trial court that a husband is under a fiduciary duty with respect to his wife's interest in the community property under his control and management. The failure of the husband in the instant case to disclose fully and fairly material facts relating to the value of community assets from which John gained an advantage constitutes a concealment of material facts and a breach of this fiduciary duty. This is constructive fraud, whether or not such failure to disclose was accompanied by an actual intent to defraud. (Civ. Code, §§ 2235, 1573, subds. 1 and 2.)

We are persuaded that the trial court misapplied the law and erred in holding that no fiduciary relationship existed during the negotiations leading up to the execution of the property settlement agreement. The facts as found by the trial court show the existence of a fiduciary relationship and constructive fraud as a matter of law.

As to the failure of the now decedent husband to disclose fully and fairly and the concealment on his part of material facts with regard to the value of assets of the community, we are satisfied from a reading of the record that this deception was not only practiced upon the plaintiff wife but upon Mr. Vai's attorney, Henry G. Bodkin, Sr., as well. At the trial of the instant proceeding, the latter testified that at the time the property settlement agreement was negotiated, his client, Mr. Vai, did not advise Attorney Bodkin, Sr., nor did the latter have any knowledge of the "after-discovered" property hereinbefore referred to, the wife's share of which amounted to $84,000. Attorney Bodkin, Sr. further testified that at no time during the property settlement negotiations did his client, defendant husband, inform him that 23 days prior to

the execution of the property settlement agreement, he had executed a sale deposit receipt for $25,000 for the sale of Rancho El Camino, at a price of $525,000, or $814 an acre, instead of $200 per acre which Mr. Vai had represented to plaintiff wife was the book value of the vineyard land at Rancho El Camino.

Defendants contend, however, that plaintiff is barred by laches and estoppel. The complaint in the instant action was not filed until March 18, 1957, although the agreement was signed by the parties on March 16, 1954. The trial court found that the plaintiff was told of the sale of Rancho El Camino by John and by one of his employees in the "Spring" of 1954, and consequently is barred by the equitable doctrine of laches: an unreasonable delay in commencing the action which has prejudiced the defendants.

To determine whether the delay has been an unreasonable one, we are guided by the applicable statute of limitations for an action at law, in this case, Code of Civil Procedure section 338, subdivision 4: "An action for relief on the ground of fraud or mistake [must be commenced within three years]. The cause of action in such case not to be deemed to have accrued until the discovery, by the aggrieved party, of the facts constituting the fraud or mistake."

There is no evidence in the record that plaintiff actually knew of the fraud before the death of her husband. However, "discovery is different from knowledge, [so] that where a party defrauded has received information of facts which should put him upon inquiry, and the inquiry if made would disclose the fraud, he will be charged with a discovery as of the time the inquiry would have given him knowledge." (*Victor Oil Co.* v. *Drum,* 184 Cal. 226, 240 [193 P. 243].)

"The circumstances must be such that the inquiry becomes a duty, and the failure to make it a negligent omission." (*Tarke* v. *Bingham,* 123 Cal. 163, 166 [55 P. 759].) "Where no duty is imposed by law upon a person to make inquiry, and where under the circumstances 'a prudent man' would not be put upon inquiry, the mere fact that means of knowledge are open to a plaintiff, and he has not availed himself of them, does not debar him from relief when thereafter he shall make actual discovery." (*MacDonald* v. *Reich & Lievre, Inc.,* 100 Cal.App. 736, 740-741 [281 P. 106].)

Assuming that plaintiff could have discovered the fraud had she investigated, defendants have not pointed out

any circumstances which should have put plaintiff upon inquiry until after John's death in 1957 when she was told that she had not been treated fairly by her husband.

Defendants argue that plaintiff is estopped and precluded from rescission by the stipulation in the agreement that it was entered into freely and voluntarily without promises or representations not contained therein, and the trial court so found. But, as plaintiff correctly points out, when the agreement itself is procured by fraud, none of its provisions have any legal or binding effect. "This provision of the contract—even if we assume that, if valid, it could redound to the benefit of the Association—was not a waiver of plaintiffs' right to maintain the action. The fraud which was the inducing cause of the execution of the contract renders the whole instrument vulnerable—the clause in question as well as all the other provisions. (*Watson* v. *Duarte,* 62 Cal.App. 52 [215 P. 1039] ; *American National Bank* v. *Sommerville,* 191 Cal. 364 [216 P. 376].) . . . 'No one can be estopped by anything contained in an instrument which instrument was itself obtained from him by fraud and deceit.' (*Hofflin* v. *Moss,* 67 F. 440, 444 [14 C.C.A. 459].) The chain cannot be stronger than its weakest link. The clause which it is claimed estops plaintiff to complain of the fraud cannot be made to survive the rest of the transaction as a shield and protection to defendants, when false representations were the efficient and inducing cause of the contract." (*Palladine* v. *Imperial Valley Farm Lands Assn.,* 65 Cal.App. 727, 747 [225 P. 291].)

It is manifest from the foregoing that plaintiff is neither estopped nor barred by laches from seeking to rescind the property settlement agreement, and that she is entitled to the relief sought because of the constructive fraud of her husband.

For the foregoing reasons the judgment is reversed.

Gibson, C. J., Peters, J., Dooling, J., and Fourt, J. pro tem.,* concurred.

TRAYNOR, J.—I dissent.

I would affirm the judgment, for the findings of the trial court are supported by substantial evidence.

In March 1953 plaintiff and her husband executed a prop-

*Assigned by Chairman of Judicial Council.

erty settlement agreement dividing their community property. This agreement was not repudiated until plaintiff brought this action to rescind it shortly after Mr. Vai's death in 1957. His will provides that the major part of his property be placed in trust for the support of his and plaintiff's daughter, who is mentally arrested, and also for the support of plaintiff should she be in need and if sufficient assets are available. After the death of both the daughter and plaintiff the remainder is to go to certain charities.

The community property of the spouses consisted of real estate, cash and securities of the value of $1,270,000 and a half interest in Padre corporation, a family-owned winery. Under the agreement plaintiff received apartment houses worth $150,000 and cash in the amount of $27,000. Her husband agreed to pay all taxes and maintenance costs of the apartment houses for plaintiff's life and guaranteed her a net annual income after income taxes of $6,000. In 1953 a commercial annuity equal to these two agreements would have cost at least $80,000.[1] She will also receive $42,000 and 47½ shares of Bank of America stock pursuant to the agreement to divide evenly all after-discovered community assets. The total of these items is over $300,000.

Moreover plaintiff received an automobile, a release from a $300,000 continuing guaranty executed by her and her husband to secure loans by the Bank of America to the Padre corporation and a release from a $75,000 guaranty for other debts. The trial court did not assign a dollar value to these items. The rest of the community property, and the Padre stock went to the husband. Plaintiff's husband also agreed, however, to pay all expenses for the support and care of their daughter. The trial court determined that the value of the obligation to provide for this care is between $515,000 and $615,000.

After deducting for the care of the daughter and the obligations assumed by Mr. Vai, the division of the community property was therefore as follows: plaintiff received property and agreements of the value of over $300,000, an automobile and a release from liability for the loans of Padre and other community debts. The husband received property of the value of approximately $350,000 to $450,000 and the Padre stock.

---

[1]This figure is based on an interpretation of the agreement least favorable to plaintiff. Under other interpretations it would be far greater.

This agreement was reached after negotiations in which the plaintiff was at all times represented by counsel of her own choice, and her counsel drafted the agreement.

Plaintiff contends that she and her attorney were induced to propose this agreement by misrepresentations of the value of some of the community assets and by the concealment of material facts regarding an offer to purchase El Camino Ranch, a 600-acre vineyard.

The trial court found that the agreement was fair and equitable, that there were no intentional misrepresentations, and that the concealment of the offer for the purchase of El Camino Ranch was not relied upon by plaintiff. In plaintiff's view these findings are not supported by the evidence.

She contends that the evidence clearly proves that she did not receive half the community property and that therefore the agreement was not fair and equitable. There was other evidence, however, from which the court could infer that the agreement was fair and equitable.

The community property consisted in large part of vineyards and other investments in the wine industry. There was evidence that the wine industry was depressed at the time of the agreement.[2] Padre, the family corporation in which the community held a half interest, incurred losses of $955,000 during the five years preceding the negotiations. During the fiscal years 1951 and 1952, the two years prior to the negotiations, Padre's losses were $339,494.40 and $196,746.75 respectively. Although its book value was $800,000, the corporation was torn by internal strife between the Vai brothers and was losing money at an alarming rate. There was also evidence that the community lemon orchards and vineyards were all operating at a loss. Moreover, some of the community securities were pledged for loans from the Bank of America.

Under the agreement plaintiff received all of the properties that interested her and that she asked for. She was relieved of any liability for the debts of the losing business enterprises and obtained many of the stable community assets. Mr. Vai received the home, which plaintiff disliked, that he and his daughter were occupying, the community securities, a lodge,

[2]Wine was selling for $0.35 a gallon at the time of the property agreement. Plaintiff's witness, a wine broker, testified that "normally the price is considerably higher . . . [t]oday the same wines are worth $0.75 a gallon" and in 1950 the price of the same wines was as high as $0.95 a gallon.

and the assets of speculative value. Plaintiff's agreement appeared advantageous given the possibility that Padre, the vineyards and the citrus groves would continue to operate at a loss as in the preceding five years.

Plaintiff and her attorney were aware of this possibility. Her attorney advised her several times to demand some of the vineyards, but she refused to have anything to do with those "money losing vineyards." What she wanted was the property that would provide for her security. Her attorney testified: "I went over the list of assets and valuations with her. She expressed to me the thought that what she wanted more than anything was security. I talked with her about the Alta Loma property and she told me that she didn't want Alta Loma, that John was happy there, and apparently the daughter, Madeline, was happy there, and that she didn't want any part of it. The same was true of Arrowhead.

"We discussed valuations somewhat in connection with the 600 acres [El Camino Ranch]. She didn't express either assent or disapproval of the $200 per acre figure that I had brought back to her she wanted the Parkside property and she wanted security.

"We then discussed what would give her that security and what she might expect out of it and I believe at that time we discussed taking the Parkside property together with the furniture and furnishings, a cash lump settlement payment, and support money for a period of limited years.

"It is my recollection that at that time we discussed the sum of $25,000 as being a cash payment in addition to the Parkside property plus $5,000 per year for five years, together with the payment of her expenses to date, and the Dodge automobile. In addition, it was still understood that Mr. Vai would be required to support the daughter." At another point plaintiff's attorney testified:

"A. Let me put it this way; there were certain assets which she could take that she didn't have to gamble on as to their future worth.

"Q. Those were the assets that you managed to get for her? A. That's correct. . . .

"Q. At the time that you visited Mrs. Vai to sign the agreement you were well aware of the fact were you not, that Mr. Vai was going to get the majority of the assets. A. Dollar wise on the valuation that had been placed on them, yes."

In evaluating the fairness of the agreement, the court could

consider that at the time of the settlement plaintiff and Mr. Vai were 66 and 71 years old, respectively, that they had a common heir, their daughter, and that plaintiff was willing to accept less than half the community property if she were given the stable rather than the speculative assets.

The finding that there was no intentional misrepresentation is supported by substantial evidence. Mr. Bodkin, decedent's attorney who was present during all of the negotiations, testified that no representations were made as to the value of Padre. There is evidence that plaintiff's attorney had a current statement of Padre's position and it is admitted that he had a 1950 Dun & Bradstreet report fixing the value of Padre at over $1,000,000. Plaintiff and her attorney were told that the Padre Company was heavily indebted, had been losing money for years, that substantially all the company's assets were "in hock," that the company owed money to the Vai brothers for back salary and that the company was in danger of insolvency. The trial court found that these representations were true. This finding is supported by evidence that Padre owed the Bank of America $480,000, that Padre lost over $950,000 during the last five years, that the wine industry was seriously depressed, that in 1952 payments of salary to John Vai and his brother had been reduced from $3,000 a month to $200 a month at the "suggestion" of the Bank of America, Padre's principal creditor, that at the time of the property agreement the salary payments to the Vai brothers were only $500 a month, that the cashier of Padre had written checks for over $40,000 but was unable to release them to the payees because of lack of funds, and by the testimony of a Bank of America official that substantially all the assets of Padre were "in hock."

Plaintiff contends that the evidence is undisputed that during the negotiations Mr. Vai received an offer to purchase El Camino Ranch for $575,000 and that this offer was intentionally not communicated to plaintiff. The trial court found that decedent received such an offer and did not communicate it to plaintiff. The court also found, however, that there was no intentional concealment of the offer. This finding is supported by the evidence. Mr. Bodkin testified that he had no knowledge of the offer, and the court could infer, as it did, that Mr. Vai was not aware of his duty to reveal this offer.

Plaintiff contends, however, that even if there were no in-

tentional misrepresentations of the value of the community property and no intentional concealment of the offer to purchase El Camino Ranch, the decedent was nevertheless guilty of constructive fraud since he owed a fiduciary duty to his wife as to the community property under his control and was therefore under a duty to state the correct value of all the community property and to reveal the offer to purchase El Camino Ranch. Plaintiff contends that the husband is a trustee for the wife as to the community property and that he must reveal to the wife the true value of all the property and correct any misapprehensions that she or her attorney may have.

The fiduciary relationship arising from our community property system is not that of a trustee and beneficiary of an express trust. A trustee has no interest in the assets of the trust and may not assume a position in conflict with the interest of the beneficiaries. Each spouse, however, has a half interest in the community property and upon division of such property the spouses are in a position adverse to each other. Moreover, the liability of a husband for management and spending of community assets is markedly dissimilar to those of a trustee of an express trust. (See Civ. Code, § 172.)

The fiduciary relationship between spouses arises from the confidential relationship between them and from the control that one spouse exercises over the community property. When a confidential relationship exists the spouses are held to a very high degree of fiduciary duty (*Burrows* v. *Burrows,* 136 Cal. App. 323, 327, 329 [28 P.2d 1072]) and no spouse will be permitted to gain any advantage from the trust and confidence placed in him or her by the other. Even when the confidential relationship is destroyed by dispute between the spouses, as the court found was the case between plaintiff and Mr. Vai, the spouse controlling the community property still owes a fiduciary duty to the other spouse. This duty, however, is analogous to the duty, not of a trustee to a beneficiary, but of one partner to another during the dissolution of a partnership. (*Cf. Lynam* v. *Vorwerk,* 13 Cal.App. 507, 509 [110 P. 355].)

The fiduciary relationship of partners extends to the dissolution of the partnership (*Page* v. *Page,* 55 Cal.2d 192, 194 [10 Cal. Rptr. 643, 359 P.2d 41] ; *Laux* v. *Freed,* 53 Cal. 2d 512, 522 [348 P.2d 873]). Partners negotiating for the division of the partnership assets may nevertheless take positions consistent with their own interest and in conflict with

those of the copartners. A partner is under a duty, however, to make all the facts available to any copartner and to disclose all facts peculiarly within his own knowledge. (*Arnold* v. *Arnold,* 137 Cal. 291, 296 [70 P. 23]; *Reed* v. *Wood,* 190 Okla. 169 [123 P.2d 275, 278]; *Law* v. *Law* [1905], 1 Ch. 140, 157; see *Colton* v. *Stanford,* 82 Cal. 351, 372, 380, 388 [23 P. 16, 16 Am.St.Rep. 137]; Crane, Partnerships, 360; Story, Partnerships, 303; 120 A.L.R. 724, 737.) "As to the confidential relation of partners, the general rule is, that it exists only as to the current business of the partnership, and that when they come to contract with each other for a dissolution of the partnership they stand at arm's length. It may be conceded that this rule is subject to the qualification that in negotiations for a dissolution each partner must deal fairly with his copartners, and not conceal from them important matters within his own knowledge touching the business and property of the partnership." (*Arnold* v. *Arnold, supra,* at p. 296; accord: *Arnold* v. *Maxwell,* 223 Mass. 47 [111 N.E. 687, 689-690].)

Likewise in negotiations for a property settlement agreement, each spouse may take a position that favors his or her interest and is opposed to the interest of the other spouse. The duty owed between spouses in negotiating property settlement agreements has been frequently defined by this court and the District Courts of Appeal. (*Collins* v. *Collins,* 48 Cal.2d 325, 331 [309 P.2d 420]; *Jorgensen* v. *Jorgensen,* 32 Cal.2d 13, 22 [193 P.2d 728]; *Estate of Cover,* 188 Cal. 133, 144 [204 P. 583]; *Hensley* v. *Hensley,* 179 Cal. 284, 287 [183 P. 445]; *Champion* v. *Woods,* 79 Cal. 17, 20-21 [21 P. 534, 12 Am.St.Rep. 126]; *Estate of Bialy,* 169 Cal.App.2d 479, 491-492 [337 P.2d 511] (hearing denied); *Cameron* v. *Cameron,* 88 Cal.App.2d 585, 593-597 [199 P.2d 443] (hearing denied); *Migala* v. *Dakin,* 99 Cal.App. 60, 64 [277 P. 898] (hearing denied); *Chadwick* v. *Chadwick,* 95 Cal.App. 690, 700-701 [273 P. 86]; see 1 Armstrong, California Family Law, 574, 576; Black, Rescission and Cancellation, § 54.) In each of these cases the court held that, after the destruction of the confidential relationship, spouses negotiating a property settlement agreement deal with each other at "*arm's length,*" with the exception stated in *Jorgensen* v. *Jorgensen* that each spouse must reveal information peculiarly within his or her own knowledge such as the existence of community property.

The Collins decision is not based solely upon waiver by the wife of the fiduciary duty of the husband. It recognizes that after the destruction of the confidential relationship between wife and husband the spouses may take positions consistent with their own interest, unlike the trustee, who has no interest in the property that he is administering. We stated in Collins that "when the parties to a marriage are negotiating a property settlement agreement with recognition that their interests are adverse and are dealing at arm's length, neither spouse owes to the other the duty of disclosure which he or she would owe if their relation remained in fact a confidential one." (*Collins* v. *Collins*, 48 Cal.2d 325, 331 [309 P.2d 420].) Likewise in *Jorgensen* v. *Jorgensen* we stated that although a spouse must reveal facts peculiarly within the spouse's knowledge, such as the existence of property, "[a] husband at the time of divorce or separation is entitled to take a position favorable to his own interest in claiming as his separate property assets that a court might hold to be community property. Confronted with the assertion by the husband that certain assets are his separate property the wife must take her own position and if necessary investigate the facts." (*Jorgensen* v. *Jorgensen, supra,* at p. 22; see also Black, Rescission and Cancellation, § 54.) When a spouse is given full access to the information necessary to negotiate a property agreement, an error of judgment by the spouse or her attorney is not ground for rescission. (*Cameron* v. *Cameron, supra,* 88 Cal. App.2d 585, 595.)

In the present case the trial court's finding that plaintiff had access to all of the information except the offer to purchase the El Camino Ranch is supported by the testimony of both plaintiff's attorney and decedent's attorney. Plaintiff's attorney made substantial investigations of his own. He testified that he had reports from Dun & Bradstreet stating that the net worth of Padre as of 1950 was $1,107,000; he also had a Dun & Bradstreet report on Mr. Vai individually; he had reports from a private detective and from a title company; he had the property he was primarily interested in (Parkside Apartments) appraised; he suspended investigation only after he had obtained such information as he thought necessary. Mr. Bodkin testified that plaintiff's former attorney received a current statement of the position of Padre and was urged to make appraisals of all the property. He was also given a list of assets that except for some inadvertent omissions listed

all of the community assets. Moreover, all books were open to his inspection. Plaintiff was therefore neither actually nor constructively defrauded as to the value of the community property.

There was a duty, however, to disclose the offer to purchase the El Camino Ranch. This offer was peculiarly within decedent's own knowledge and the failure to disclose it was a breach of duty. (*Jorgensen* v. *Jorgensen, supra,* 32 Cal.2d 13, 21; see *Arnold* v. *Arnold, supra,* 137 Cal. 291, 296; *Reed* v. *Wood, supra,* 190 Okla. 169 [123 P.2d 275, 278]; *Law* v. *Law, supra* [1905], 1 Ch. 140, 157; Crane, Partnerships, 360; Story, Partnerships, 303; *cf.* Civ. Code, § 1573.) If the lack of knowledge of the offer affected the dealings of the parties, plaintiff would be entitled to rescission or in the court's discretion to damages resulting from the failure to disclose the offer. (See *Arnold* v. *Maxwell, supra,* 223 Mass. 47 [111 N.E. 687, 690]; *Turner* v. *Otis,* 30 Kan. 1 [1 P. 19, 21]; 5 Williston, Contracts, 4192-4193.)

The court found, however, that plaintiff failed to prove that she would not have entered into the agreement had she known of the offer. Under such circumstances a contract cannot be rescinded. (*Colton* v. *Stanford, supra,* 82 Cal. 351,. 399; *Oppenheimer* v. *Clunie,* 142 Cal. 313, 318-319 [75 P. 899]; *Greenawalt* v. *Rogers,* 151 Cal. 630, 635 [91 P. 526].) Likewise, damages will be denied to a plaintiff who fails to prove that he relied on the misrepresentation. (*Hobart* v. *Hobart Estate Co.,* 26 Cal.2d 412, 422, 444-447 [159 P.2d 958]; *cf.* Civ. Code, § 1568.)

Reliance is an essential element not only of intentional fraud but of constructive fraud arising from a breach of fiduciary or other duty. (*Hobart* v. *Hobart Estate Co., supra* [breach of duty by officer of a corporation owing fiduciary duty to stockholder]; *Colton* v. *Stanford, supra,* 82 Cal. 351, 399-401 [dealings between business associates owing fiduciary duties to each other]; *Hensley* v. *Hensley, supra,* 179 Cal. 284, 287 [property settlement agreement]; *Verdier* v. *Verdier,* 133 Cal.App.2d 325, 328 [284 P.2d 94] [property settlement agreement]; *Pinney & Topliff* v. *Chrysler Corp.,* 176 F.Supp. 801, 803.)

In *Hobart* v. *Hobart Estate Co.* we reversed a judgment for damages for fraud by a fiduciary because the issue of justifiable reliance was taken from the jury by erroneous instructions of the trial court. Likewise in cases identical with the

present case, this court and the district courts of appeal have held that proof of reliance on the alleged misrepresentation of a spouse is necessary to rescind a property settlement agreement. (*Hensley* v. *Hensley, supra,* 179 Cal. 284, 287; *Verdier* v. *Verdier,* 133 Cal.App.2d 325, 328-329 [284 P.2d 94].) When an inadvertent omission to disclose facts that there is a duty to disclose or an erroneous statement by a fiduciary does not influence plaintiff's conduct, rescission of a settlement agreement is properly denied. (Civ. Code, §§ 1689, 1567 and 1568; 1 Harper and James, The Law of Torts, p. 603; Prosser, Torts, § 89; Pomeroy, Equity Jurisprudence, § 890; Fleming, Torts, pp. 656-657; Rest., Contracts, §§ 471c, 476b, 476c; Rest., Restitution, § 9b.)

The court's finding that plaintiff would have entered into the contract even had she been informed of the offer to purchase the El Camino Ranch is supported by substantial evidence. Plaintiff's former attorney when asked if, at the time he made the property settlement offer, he had sufficient information upon which to base such offer, testified: "Well, I felt that I had sufficient information at that time to enable me to negotiate a settlement that would be satisfactory to my client without further investigation as to the value of the San Bernardino County property. I thought that perhaps the valuations placed on the land by Mr. Vai might be low in some instances, but on the other hand, Mrs. Vai at that time had expressed to me a desire that she did not want to participate in the Arrowhead, the Alta Loma, or the El Camino properties and therefore under the circumstances I felt that the assets and the support which she might acquire under the terms of the letter of the 9th would possibly be beneficial to her."

The attorney further testified that he realized that El Camino Ranch "had a potential future value in excess of anything that we had discussed," that he advised plaintiff in attempt to secure a part of the vineyard lands in San Bernardino County, but that she indicated that she did not want any interest in the vineyards, but wanted other assets to compensate for them.

From the foregoing testimony the court could infer that plaintiff would have entered into the agreement even had she known of the offer for El Camino Ranch. This inference is particularly reasonable since the offer to purchase El Camino Ranch provided for only a small down payment and a large purchase-money trust deed to secure the remainder of the pur-

chase price. Such a transaction entailed a considerable risk that the price of the land would not be paid if the vineyards continued to be unprofitable. The testimony of plaintiff's attorney indicated that plaintiff was not interested in taking such risks and that she wanted the stable community property assets even at the expense of securing considerably less than half the community property. Moreover, the offer to purchase the ranch was for the fair market value of the property. Such offer therefore neither enlarged nor diminished the value of the community property.

Plaintiff contends that even if she is not entitled to relief under the ordinary rules regulating property settlement agreements between spouses her husband nevertheless assumed special duties toward her. Previous to the property settlement agreement plaintiff attempted to take her husband's deposition. Mr. Vai, however, was ill and unable to give the deposition. His attorney therefore suggested that the deposition be postponed and promised to supply all information requested by plaintiff.

The evidence supports the trial court's finding that Mr. Vai was ill at the time the deposition was to be taken and that he supplied all the information requested. There was no further request for a deposition. Plaintiff's attorney indicated that he had obtained all the information he required. The promise to supply all the information requested without formal depositions did not place decedent in any special position of trust. Moreover, the trial court found that plaintiff did not in fact place confidence in her husband but independently investigated the facts in which she was interested.

Schauer, J., concurred.

Respondents' petition for a rehearing was denied August 23, 1961. Fourt, J. pro tem.,* participated in place of McComb, J., who deemed himself disqualified. Traynor, J., and Schauer, J., were of the opinion that the petition should be granted.

---

*Assigned by Chairman of Judicial Council.