[Civ. No. 23668. First Dist., Div. One. Aug. 12, 1968.]

CORINA JONES, Cross-complainant and Appellant, v.
SAMUEL H. KAUFFMANN, Cross-defendant and Re-
spondent.

Adams, Carman, Mansfield, Ball & Wenzel, E. Day Carman and Paul Mansfield for Cross-complainant and Appellant.

Crist, Peters, Donegan & Brenner, John M. Brenner and Beverly A. Gregerson for Cross-defendant and Respondent.

ELKINGTON, J. — Cross-complainant Corina Jones (Corina) sought in the court below to rescind and cancel a property settlement agreement entered into in 1961 with her then husband Samuel Kauffmann (Samuel) which had been merged in a Nevada divorce decree. From a judgment entered in favor of Samuel she appeals.

Her sole claim of error is that in material respects the trial court's findings are not in accordance with the evidence. In such a case the power of this court begins and ends with

the determination as to whether there is any substantial evidence, contradicted or uncontradicted, which will support the contested findings of fact. (*Green Trees Enterprises, Inc.* v. *Palm Springs Alpine Estates, Inc.*, 66 Cal.2d 782, 784 [59 Cal.Rptr. 141, 427 P.2d 805].) Accordingly, we state the facts in the light most favorable to the findings and judgment.

The parties were married in 1945 and thereafter had five children. For several years after the marriage the family subsisted principally on trust fund income of Corina while Samuel finished his education. In 1953 Samuel and Wayne Brown formed a partnership for the purpose of buying and developing land, and building and selling homes. The partnership's initial capital consisted of $2,000. By 1961 it had become a very successful enterprise. Early in their marriage the parties had purchased 42 acres of land in Portola Valley at a price of $100 per acre. They eventually built for themselves a home on this property at a cost, exclusive of the land, of $210,000.

Marital difficulties arose in 1959. They talked to their family lawyer about a divorce and sought assistance from a marriage counselor. They tried, without success, to accomplish a reconciliation, but they "were still hanging around trying to get back together." They talked about a property settlement agreement, always with the understanding that the community property would be divided equally. Corina testified that a "fair, equal, equitable, 50-50 split down the middle of the community property which we decided [upon] would be that I take the house [with the 42 acres of land], the furniture, and the car," and that Samuel would take the community interest in the business. The approximate valuation placed by Samuel on the share which each would take was $300,000.

In the summer of 1960, Corina, without Samuel's knowledge, arranged to have the home property appraised. Three independent appraisals by real estate brokers of the home *with one acre* of land were respectively $120,000, $150,000, and $199,000. At about the same time Samuel secured an appraisal of the home with the 42 acres of land. This appraisal was for $300,000.

In the spring of 1961, after an attempted reconciliation, Corina decided that there must be a divorce. She employed an attorney, Mr. Eustice, for that purpose. Her attorney filed a divorce action in San Mateo County, April 20, 1961, and commenced negotiating a property settlement with Samuel's attorney, Mr. Peters. A settlement offer was made through Mr. Peters under which Corina would receive "the house and sur-

rounding property clear of encumbrances'' and Samuel would take the community interest in the business in which he was an equal partner. On June 5, 1961, Mr. Eustice received a net worth statement from Mr. Peters showing the net value, after liabilities, of the community property to be $473,122.

Mr. Eustice thereupon commenced an investigation into the community assets and their value. He arranged with Mr. Peters for Samuel's deposition. When Corina learned of the proposed deposition she told Mr. Eustice ''that she didn't see any sense in it,'' and that it was not necessary. She ordered him ''not to do it''; in accordance with such instructions the deposition was not taken. Mr. Eustice did, however, interview Samuel at length and testified that Samuel cooperated fully, answering all questions propounded at the interview which was not under legal compulsion.

Around this time, against her attorney's advice, Corina decided to get her divorce in Nevada and went there to establish a residence. She had formed an intention to marry Mr. Jones, her present husband, ''as quickly as I could.'' At her request Samuel paid all her Nevada expenses. Mr. Eustice recommended and employed a Nevada lawyer, a Mr. Crowell.

While Corina was in Nevada, Mr. Eustice again tried to inquire into the community property by taking depositions. Hearing about this, Corina wrote a letter to him, in part, as follows: ''I want out. And I mean out. Right now. A deposition in September!? . . . Gordon, I don't know who is trying to kid whom but this thing has gone on long enough and I know it. I really am beginning to wonder if you are on my side. You keep telling me to let you alone if I hired you. I have called you a lot, for reassurance, things I didn't understand and one thing or another. But I have also been fighting the feeling that your activities have not been strictly in my best interests. Lately. I don't want this thing dragged out any further or any dirtier. I don't want any more time lag either. I would like the car paid for. The house paid for (stipulated) and I will take my chances on how much I get for it. Sam is not out to [take advantage of] me or the children. I agree with you that he is not out to do me many favors either, at this point, but I prefer it this way. As far as the child support is concerned, I would have liked to have gotten more—for them—but I think if I run into serious difficulty later on, he will help. If he can. He has not been the one to influence me either. I have not talked to him recently. These are my own thoughts. Based on my own feelings.''

The proposed depositions were never taken. Mr. Eustice, however, did succeed in employing Robert Frank, a certified public accountant, to examine the community and business books.

The business assets consisted mainly of land, the value of which was carried on the books at cost. Mr. Frank concluded that this land, purchased at various times during the previous few years, had appreciated in value. He also inquired into the value of the home, its furnishings and the surrounding land. The home and furnishings were carried on the books at $210,000. Mr. Frank accepted this valuation. The 42 acres, purchased years before at $100 per acre, were carried at $700 per acre. Mr. Frank rejected this figure and after a conference with the office manager of Brown & Kauffmann (in which Samuel was in no way involved) fixed the land valuation at $3,000 per acre, or a total of $126,000. He concluded that the assets of the community estate had a net value of $683,000.

Corina was promptly advised of Mr. Frank's evaluation by Mr. Eustice. He cautioned her against taking such an expensive house stating that it could be more of a liability than an asset. He recommended strongly against accepting the proposed settlement, saying that it ''wasn't fair and it wasn't equal.'' He wrote to her, stating: ''Insofar as the financial statements are concerned, I have found Mr. Frank to be a very capable and fair accountant. I think you should consider that there is an obvious reason for your husband to understate his position. In the first place, it is to the advantage of all not to pay any more taxes than need be. In the second place, whether you like it or not, I would assume that he is interested in getting as satisfactory a settlement as he can. If I were representing your husband and Mr. Peters were representing you, I know that our roles would be no different than they are now. [ ¶ ] It is my job to get as much for you as I can and it is Mr. Peters' job to do the same for your husband. If you will forget this as being a friendly game of cricket and come down to earth, I think you will understand more fully your roles. . . . Your other plans probably seem pretty important to you now, but ten years from now when the money you could have gotten would be useful, you may wish you had followed my advice. . . .''

Soon afterwards Corina communicated with Mr. Eustice, telling him she wanted a property settlement agreement and to get in touch with Mr. Peters. At about the same time she talked to Samuel on the telephone. She testified, ''I told him

that I had told Mr. Eustice I no longer needed him, so would he have Mr. Peters draw up the property settlement as we discussed before." Mr. Peters prepared an agreement under the terms of which Corina would take the home and its furnishings, the 42 acres of land, all unencumbered, and a new 1961 automobile. Under its terms Samuel would pay the taxes, and for the upkeep, of the home for one year, $750 per month alimony, and $1,000 per month for the support of five children. He had already paid $2,500 of Corina's attorney fees.

The proposed agreement was forwarded to Samuel, with a request that it be reviewed, and, if found in order, signed and returned to Mr. Peters. However, on the morning of its receipt by Samuel he received a telephone call from Corina in Nevada. The following conversation took place according to Samuel's testimony: "She said, 'What's happening'? I said, 'I have just received the papers from Mr. Peters and I am to review them and return them to him and he will then send them to Mr. Eustice and they will handle it however they see fit.' She then instructed me not to return them to Mr. Peters or to Mr. Eustice but to send them directly to her . . . or Mr. Crowell in Carson City."

Samuel sent the papers to Corina who took them to Mr. Crowell, her Nevada attorney. She testified: "Well, he asked me to read it over and he read it over himself. He said, 'Does this seem all right to you?' I said, 'Sure. It is what we have been talking about all along. It is about the same.' " Mr. Crowell telephoned Mr. Eustice telling him that the property settlement agreement was in Nevada and commenting on the peculiar way of doing business. He then proceeded to secure a Nevada divorce decree. At the hearing Corina testified that she had had the benefit of independent counsel in the property settlement agreement's preparation and that she believed it to be fair and equitable. The agreement was approved by the court and incorporated in the decree.

By the agreement, according to the values set out in Samuel's net worth statement, Corina took property[1] worth $242,400, slightly more than one-half of the stated community net worth of $473,122. According to the Frank appraisal she took property of a value of $339,000. This, with the one year's taxes and upkeep of the home promised by Samuel, was approximately one-half of Mr. Frank's appraisal of $683,000.

---

[1]The trial court found the new automobile which she took under the agreement to be valued at $3,000.

The contention of the parties on this appeal relate to the obligations of a husband upon a pending dissolution of the marriage, and the negotiation of an agreement for division of the community property.

*Vai* v. *Bank of America,* 56 Cal.2d 329 [15 Cal.Rptr. 71, 364 P.2d 247], holds the duty of the husband in such a situation to be of a dual nature. By virtue of the marriage he occupies a confidential relationship with his wife. Such a relationship exists between two persons when one has gained the confidence of the other and purports to act or advise with the other's interest in mind. On the other hand, because of the husband's management and control over the community property he holds the position of trustee for his wife in respect to her one-half interest in the community assets. As such trustee it is part of his fiduciary duties to account to his wife for the community property when the spouses are negotiating a property settlement agreement. Accordingly, ''the husband's fiduciary duties in respect to his wife's interest in the community property continue as long as his control of that property continues, notwithstanding the complete absence of confidence and trust, and the consequent termination of the confidential relationship.'' (P. 338.)

Corina contends that the trial court erred in finding that the confidential relationship arising out of the marriage did not exist during the property settlement negotiations, and at the time of the divorce.

The record before us contains ample evidence from which the court reasonably could have concluded that the confidential relationship between the parties had ended. It shows that Corina was represented by an attorney of her choice. She had the benefit of the investigation and appraisals of Mr. Frank. She, herself, had, independently of Samuel, caused appraisals to be made of the home property. Discussing the agreement she wanted, and speaking of Samuel, she told her attorney, ''I agree with you that he is not out to do me many favors either, at this point, but I prefer it this way. . . . He has not been the one to influence me either. I have not talked to him recently. These are my own thoughts. Based on my own feelings.''

*Collins* v. *Collins,* 48 Cal.2d 325 [309 P.2d 420], concerned a situation quite similar to that of the case before us. There the court said: ''Plaintiff, however, had ample opportunity to investigate, with the aid of independent counsel, the character and value of the property of the parties. Plaintiff had con-

templated obtaining a divorce for some time before she made the property settlement agreement and obtained the divorce. Defendant did nothing to hinder her investigation of the property or to cause her to execute the agreement precipitately. Defendant owed plaintiff no duty to force her to investigate the properties when she announced that she was satisfied with the agreement prepared by defendant's counsel [P. 329.] . . . Here the parties were dealing with one another at arm's length—or at least the husband gave the wife every opportunity to deal at arm's length—when the settlement agreement was negotiated. The wife had independent advice." (P. 330.) The court in *Collins* held that the confidential relationship arising out of the marriage had been terminated before the property settlement agreement was entered into.

 There still remains for our consideration the fiduciary relationship resulting from Samuel's management of the community property. In this context Corina claims that Samuel failed to disclose material facts relating to the community assets and their value.

Mr. Frank, Corina's certified public accountant, testified at the trial below as follows: "Q. Now, did Mr. Eustice explain to you that you were to make your own arrangements as to time and place of contact with the Kauffmann people? A. Yes. Q. And was there any restriction placed on you as to what you were to examine as to the kind of asset or the location of the asset, or how you would conduct your investigations, whether land was appraised, or not appraised, or any restrictions on time or quality or quantity of your investigation? A. There were no restrictions. Q. Did you have an absolute blanket free rein? A. Yes. Q. Anything you wanted, they were to get? A. Yes. Q. Any area you wanted to pursue, you could pursue? A. Yes. Q. This was whether books were readily available or we had to procure them through our own efforts? A. Yes. Q. And when you contacted the Kauffmann organization, did you find them cooperative or reluctant to cooperate? A. They were cooperative. Q. Was everything you ever asked for produced? A. Yes. Q. Was every question you ever asked answered? A. Yes. Q. Anywhere along the line did you find any concealment or nondisclosure? A. No."

Mr. Eustice also testified that there was no concealment or nondisclosure of the business assets. He stated: "I have never suggested that there was ever any nondisclosure. There was a difference of opinion on the valuation."

Corina, however, points out nine specific instances of non-disclosure which we shall now discuss.

1. The Cox parcel of 20.86 acres. This parcel did not appear by name on the net worth statement. An attempt of an accountant to explain why it did not so appear was foreclosed by plaintiff's objection. However, the books of the business which were made available to Mr. Frank reflected this item. They showed that the property was acquired in November 1960 by the execution of notes for $176,976.33 by Brown & Kauffmann companies and that there was no net equity. Assuming no value increase in the five months since its purchase, its inclusion in the net worth statement would not have changed the net worth result.

2. The Leider property. This property was purchased July 31, 1961, several weeks after the delivery to Mr. Eustice of the net worth statement and about two weeks before Corina's Nevada divorce decree. Samuel testified ''he would assume'' that he told Corina of this acquisition but he was not sure. The cost of the property was $1,009,375, while the loans against it were $1,008,000, leaving a net equity of $1,375. It would appear that even the $1,375 cash paid out must have been reflected as an asset of the earlier net worth statement.

3. Failure of Samuel to disclose his earnings following the April 30, 1961, net worth statement. The record shows that Corina knew that Samuel was drawing a salary from the business. No request for such salary information was made, and the books of the business which showed the amounts paid to Samuel were made available to Mr. Frank.

4. Nondisclosure of Lot 225 Corporation. This corporation was organized June 16, 1961 (six weeks after the net worth statement), whereupon an asset was transferred to it from another Brown & Kauffmann corporation. The evidence indicated that this transaction did not affect Samuel's net worth; it simply reduced the value of one company and enhanced that of another.

5. Discrepancy between net worth statement and financial statement furnished bank. The bank statement was made around April 30, 1961 and represented the net value of the business assets as of the last audit period ending January 31, 1961. The net worth statement furnished Mr. Eustice was for the period ending April 30, 1961 and was prepared ''well after that date.'' There was no discrepancy.

6. The business goodwill. Witnesses testified that businesses

of the type here involved had no goodwill value. There was thus nothing to disclose.

7. The profit sharing plan and partnership buy-sell insurance. Information as to these items was made available to Mr. Frank. The reciprocal partnership insurance had virtually no cash value. Samuel's interest in the profit sharing plan was only $150.

8. The acquired assets and earnings from April 30, 1961 until August 18, 1961, the date of the divorce. Corina and her attorney knew that the financial condition of Samuel's business must necessarily change from day to day. Samuel's duty of disclosure, at least in the absence of a request for current information, was reasonably fulfilled by the broad authority given Mr. Frank and Mr. Eustice to examine the pertinent books and records.

9. Failure to disclose the actual value of the partnership assets, rather than their cost. Samuel's net worth statement reported the book value of the partnership holdings, at its cost of $4,709,000, less liabilities of $4,222,891. At the trial Corina produced an appraiser who placed a gross value on the property of $5,610,000 as of the date of her divorce. She contends that Samuel's failure to disclose this ''true value'' constituted a fraudulent concealment.

The evidence indicates that the only value information known to Samuel was the cost of the various parcels of property at the time of their purchase, in most cases a relatively short time before. ■ A husband as manager of the community property is bound to make full disclosure to his wife of the items of community property and such information as he may have concerning their values. (*Vai* v. *Bank of America, supra,* 56 Cal.2d 329.) Having done this he has fulfilled his fiduciary duty, particularly where, as here, the wife has the benefit of independent advice and an opportunity herself to determine the value of the community estate. Moreover, the court could have concluded from the evidence that the value of the property in question was in fact equivalent to its cost. ■ It is well established that evidence of the cost of property is admissible as tending to show its value. (*Yoakum* v. *Hogan,* 198 Cal. 16, 20 [243 P. 21]; *Breznikar* v. *T. J. Topper Co.,* 46 Cal.App.2d 435, 438 [116 P.2d 176].)

It is noted that Corina's appraiser-witness valued the home and 42 acres at $103,600. This is in contrast to the valuation given by the three real estate brokers who had previously appraised the home for her. Their valuation of the home and

one acre of land were respectively, as previously stated, $120,000, $150,000 and $199,000. These values, added to Mr. Frank's appraisal of the remaining 41 acres, bring the total respective values to $243,000, $273,000 and $322,000. This disparity may well have been considered by the court in determining the credit to be given the witnesses' testimony.

We conclude that the findings of the trial court that Samuel had disclosed to Corina all material facts known to him relating to the community property is supported by the evidence.

The judgment is affirmed.

Molinari, P. J., and Sims, J., concurred.